18044

William D. TAYLOR, Appellant, v. SOUTH CAROLINA STATE HIGHWAY DEPARTMENT, Respondent

(130 S. E. (2d) 418)

*Messrs. John A. Mason* and *McLeod & Singletary,* of Columbia, *for Appellant,*

*Messrs. Daniel R. McLeod, Attorney General, James S. Verner, Assistant Attorney General,* and *Fulmer & Barnes,* of Columbia, *for Respondent,*

March 28, 1963.

BRAILSFORD, Justice.

. Plaintiff was seriously injured when an automobile in which he was a passenger collided with the rear end of a tractor-trailer of Southeastern Sand Company. The tractor-trailer was stopped in plaintiff's lane of travel behind a motor grader of the Highway Department. Plaintiff brought this action against the Sand Company and the Department. He took a voluntary nonsuit to to the Sand Company. At the conclusion of all of the testimony the trial judge directed a verdict in favor of the Department and plaintiff has appealed on exceptions which raise two issues—whether a reasonable inference may be drawn from the evidence that the operator of the motor grader was guilty of actionable negligence, and whether plaintiff was guilty of contributory negligence as a matter of law. Our conclusion as to the first issue makes it unnecessary for us to pass on the second.

The collision occurred on a clear morning in April, 1960, on Highway 321, several miles north of the city limits of Columbia. Plaintiff and his companion were traveling from Columbia toward Chester, in the proper lane for north bound traffic. An employee of the Highway Department was engaged in scraping a deposit of clay from a segment of this lane of the highway. The clay had been dropped by trucks entering the highway from a clay pit and extended in a northerly direction some five or six hundred

feet toward Crane Creek. The motor grader made one run from the entrance to the clay pit to the end of the deposit. This did not clear the highway and the operator commenced backing to get into position for another run. He testified that he watched for traffic in both directions and saw the sand truck as it rounded a curve about 1,000 feet south of him. He continued to back for about 50 feet; then, seeing an automobile approaching from the opposite direction, he stopped in the north bound lane to wait for traffic to clear. He also saw the car in which plaintiff was traveling as it rounded the curve, at least three or four hundred feet behind the sand truck. He further testified that the sand truck came to a gradual stop behind the motor grader. After an interval of 2 or 3 seconds, the south bound car passed in the opposite lane; in another second or two he heard the noise of the collision which resulted in plaintiff's injuries and in the death of his companion.

Plaintiff testified that as a result of his injuries he has suffered a loss of memory as to the events immediately preceding the collision. He recalls leaving home and driving along Highway 321 for several miles in a 35 mile per hour speed zone. This limitation on speed was adhered to by the driver and nothing unusual attracted plaintiff's attention. He does not recall reaching the end of the 35 mile per hour zone, which terminated on the down grade side of a hill on a slight curve (approximately two degrees) overlooking the scene of the collision and Crane Creek. He does not remember seeing the tractor-trailer or the motor grader and remembers nothing of the accident itself, except as follows:

"Q. What is, or what recollection, if any, do you have concerning the accident itself?

"A. The thing that is in my mind is that we were riding along in the car, and everything was just smooth and normal, and all of a sudden, I saw this cloud of dust—it seemed to be real prevalant like, all over the front of the car—and I threw my hands up in front of my face, and that is all that I remember; throwing my hands up in front of my face when I saw the dust cloud.

"Q. At the moment you saw the dust cloud, what was the position of the car in which you were riding in relation to the cloud of dust?

"A. We were entering it. I believe that we were, you know, driving into it.

"Q. Well, how far away from that dust cloud were you when you have this recollection of seeing it?

"A. Oh, like at the end of the hood. We were just driving right into it.

"Q. Right at the end of the hood?

"A. Yes, sir.

*   *   *

"Q. Were you rendered unconscious by the impact?

"A. Yes, sir.

"Q. Do you have any recollection of anything happening at the scene of the accident?

"A. Nothing at all."

The investigating highway patrolman was called as a witness by plaintiff. He arrived at the scene shortly after the collision and found the tractor-trailer in the north bound lane. The front of the automobile was jammed between the rear wheels of the trailer. No skid marks or brake marks had been made by either vehicle. The motor grader "had been pulled over." There was a considerable amount of dirt on the highway and it was dry. The point of impact was 217 feet north of the clay pit road and it was apparent that the road surface had been scraped from this road to a point considerably north of the point of impact. There were no signs in place indicating that work was in progress on the roadway. One approaching the scene of the collision from the south has a clear view of it for a distance of about 1,000 feet.

The motor grader was of conspicuous size and color—6 feet, 5 inches wide, 8 feet, 6 inches tall and 19 feet 7 inches long and painted yellow.

A map of the segment of highway in question and photographs of it were offered in evidence by plaintiff. The map

commences at the 55-mile speed limit sign on the south and extends to Crane Creek on the north. The intervening distance is 1700 feet. One of the photographs was taken in the north bound lane from a point south of the 55-mile sign. This sign, the back of the 35-mile sign on the opposite side of the highway, the patrolman standing at the point of impact (more than 900 feet north of the sign), the east rail of Crane Creek bridge (1700 feet north of the sign) and the highway for a considerable distance beyond the bridge are in clear view. As indicated, this 55-mile sign is located on a downgrade and slight curve. The photograph and map show clearly that the topography for some distance south of the sign and for at least 400 feet north of it is such as to prevent intervening traffic from obstructing a motorist's view of the highway between the clay pit road and Crane Creek. In other words, plaintiff and his companion had a clear view of the tractor-trailer *and* of the motor grader from a point south of the 55-mile sign to a point four or five hundred feet north of it. However, the highway is flat and straight for the last four or five hundred feet south of the point of impact and it is reasonable to infer that the tractor-trailer did obstruct their view of the motor grader after they reached this section of the highway.

In their brief, able counsel for the appellant contend that the evidence, when construed in the light most favorable to him, as required, is reasonably susceptible of the inference that the operator of the motor grader was negligent in these particulars: (1) in not placing signs or flagmen to warn approaching motorists of the work being done on the roadway; (2) in continuing to back on the highway for a distance of 50 feet after he observed the approach of the sand truck in the lane occupied by him; and (3) in stopping on the main or traveled portion of the highway when it was practicable to stop off such part of the highway. All of which, quoting from the brief, "caused the sand truck to stop in such a manner as to create a cloud of dust, obscuring the vision of the following vehicle and resulting in the collision

between the sand truck and the automobile in which the plaintiff was riding as a passenger."

At the trial, counsel claimed that the failure to provide signs or other warning of the work in progress violated the following rule adopted by the Department for the guidance of its employees, and that the violation of a safety rule is negligence *per se:*

"When maintenance or reconstruction work is being performed on the roadway (traveled portion of highway) and one-way traffic is being maintained through the section under repair, signs should be placed and maintained as shown in Figure 15. The posting of flagmen at each end of the section under repair is necessary when maintaining one-way traffic, except in cases in which traffic volume is relatively light and high speeds do not prevail, or in cases in which the road section under repair is not more than 100 feet in length and the signs are clearly visible to approaching traffic for a distance of 500 feet. Where a flagman is used, the flagman shall hold one lane of traffic while traffic in the opposite direction proceeds through the section under repair."

We think that the work in progress and the presence of the motor grader on the highway created a passing situation for north bound traffic, rather than a one-way traffic situation within the meaning of the rule. The only reasonable inference from the record is that the work site was open and visible for such distances in both directions that a traveler on the highway, in the exercise of reasonable care, could not have failed to observe the presence of the motor grader and the partial obstruction of the highway by it in ample time to avoid injury to himself or to others.

In *Epps v. South Carolina State Highway Department,* 209 S. C. 125, 39 S. E. (2d) 198, it was said:

"The appellant (The Highway Department) is not an insurer of the safety of travelers over the highways of the State, and its duty is performed when it keeps the highways in a reasonably safe condition for travel, and erects and

maintains sufficient signs, guard rails and warnings as may enable users of said highways, exercising ordinary care and prudence, to avoid injury to themselves and others.* * *"

The duty to maintain signs and warnings exists when reasonably necessary to enable travelers, exercising ordinary care and prudence, to avoid injury. The corollary of this proposition is that "No warning need be given of obstructions which should be discovered by a traveler in time to avoid injury therefrom, in the exercise of ordinary care." 25 Am. Jur., Highways, Sec. 411, pg. 706.

Whether signs or other warnings of temporary obstructions are required in the exercise of due care depends upon existing circumstances and ordinarily presents a jury issue. This is illustrated by *Deese v. Williams,* 237 S. C. 560, 118 S. E. (2d) 330, on which appellant relies and from which we quote:

"* * * [W]e think it may be reasonably inferred that appellant was negligent in failing to give northbound traffic adequate warning of the danger created by stopping its truck [which was engaged in clearing snow from the highway] 200 feet below the crest of the hill. * * * It was for the jury to say whether in the exercise of ordinary care, the employees of appellant should have anticipated the possibility of a vehicle going north coming over the hill and being unable to stop in time to avoid a collision. * * *"

Here the morning was clear, the pavement was dry, traffic was not heavy and the work site was clearly visible for a long distance in both directions. The topography enhanced the opportunity of a motorist traveling northward to observe the motor grader. It was in plain view of plaintiff and his companion when they rounded the curve some 1000 feet south of it. No sign was required to warn them of what was obvious at a greater distance than such signs, when appropriate, are required to be placed. If plaintiff and his companion were unaware of the presence of the motor grader on the highway, it must be attributed to their

failure to keep a reasonable lookout, rather than to the failure of the operator to put out warning signs. Under the particular circumstances of this case no reasonable inference of negligence can be drawn from the absence of such signs.

The second specification of negligence complains that the operator continued to back for some fifty feet after he observed the said truck coming around the distant curve. It is clear from the record that a significant interval of time intervened after the backing movement was discontinued before an emergency situation arose. No reasonable inference of either negligence or of causal connection may be drawn therefrom.

Lastly, the appellant urges that the respondent violated sec. 46-481, Code of Laws 1962, which prohibits stopping or parking a vehicle on the main traveled part of a highway when it is practicable to stop or park such vehicle off of such portion of the highway. Motor vehicles and other equipment, "while actually engaged in work upon the surface of a highway," are exempted from the requirements of the section relied upon, and from the other provisions of the Uniform Act Regulating Traffic. Sec. 46-290, Code of Laws 1962. The operator of the motor grader violated no statutory duty by stopping it in the north bound lane of travel and, under the facts which have been stated, no reasonable inference of negligence arises therefrom.

We now refer briefly to the contention of appellant that the claimed delicts on the part of the Department "caused the sand truck to stop in such a manner as to create a cloud of dust" which obscured the vision of the driver of the automobile in which plaintiff was riding and resulted in the collision.

The complaint did not attempt to fasten responsibility for such dust as was present on the Department. Instead, it alleged that the negligence of the Sand Company, in several specified particulars, caused sand and dust which obscured

vision. These allegations, together with all other specifications of negligence against the Sand Company, went out of the case when the voluntary nonsuit was taken, leaving no reference whatever to dust in the specifications of negligence on which the case was tried.

Furthermore, the testimony is insufficient to sustain a conclusion that dust was present in sufficient density to obscure the sand truck or other objects on the highway. Because of his amnesia, plaintiff's testimony, which has been quoted, is palpably insufficient. According to his medical testimony, it was "plausible" for him "to be able to recall one specific thing, but not recall other associated facts." He remembers seeing the dust but does not recall whether he also saw the truck. Under the circumstances, his failure to remember has no tendency to establish that the truck was invisible.

The only other inferences to dust are found in the following questions and answers, the first during the direct examination of the operator of the motor grader and the second during his cross-examination:

"Q. When the truck stopped, did it make any dust?
"A. Yes, sir, a good bit of dust.

\* \* \*

"Q. It was very dusty, wasn't it?
"A. It was when the truck went along there, yes, sir."

Conditions may be accurately described as very dusty without suggesting the presence of sufficient dust to obscure vision. In addition, there is no inference that any appreciable dust was present until the truck reached the clay pit road, 217 feet north of the point of collision. By this time, plaintiff and the driver of the automobile had had full opportunity to see the motor grader in the highway.

Affirmed.

TAYLOR, C. J., and MOSS, LEWIS and BUSSEY, JJ., concur.