152 P.3d 504

The ESTATE OF Aloysius KLINK, by its Special Administratrix, Hildegard T. KLINK; Dania M. Klink, a minor, by Hildegard T. Klink, as Her Next Friend; Hildegard T. Klink; Diana Klink–James; Julia A. Klink; and Alexander M. Klink, Plaintiffs–Appellants,

v.

STATE of Hawai'i, Defendant–Appellee,

and

Subaru of America, Inc.; Gordon Souder; Paul S. Ogasawara; John Does 1–10; Jane Does 1–10; Doe Business Entities 1–10; Doe Corporations 1–10; and Doe Governmental Agencies 1–10, Defendants.

No. 25430.

Supreme Court of Hawai'i.

Feb. 20, 2007.

Michael P. Akana, Gary A. Berticevich, and Kevin H.S. Yuen, on the briefs, for the plaintiff-appellant Estate of Aloysius Klink.

Robin M. Kishi, Deputy Attorney General, on the briefs, for the defendant-appellee State of Hawaiʻi.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by LEVINSON, J.

The plaintiffs-appellants Hildegard T. Klink, individually, as special administratrix of the estate of Aloysius Klink (Klink), and as next of friend of Dania M. Klink, a minor, Michael Klink, Diana Klink–James, Julia A. Klink, and Alexander M. Klink [hereinafter, collectively, "the Appellants"] appeal from the October 7, 2002 amended judgment of the circuit court of the third circuit, the Honorable Riki May Amano presiding, in favor of the defendant-appellee State of Hawaiʻi [hereinafter, the State] and against the Appellants.

The present matter concerns the death of Klink in an automobile accident, which occurred on the island of Hawaiʻi on March 9, 1997. The Appellants raise sixteen points of error on appeal, contending in substance that the circuit court: (1) erred in concluding that

the State fulfilled its duty to design, construct, and maintain the highway and its duty to warn; (2) abused its discretion in excluding evidence of prior and subsequent accidents near the site of the subject accident; (3) clearly erred in finding that a warning sign was in place on the morning of the accident approximately 500 feet before the accident site; and (4) abused its discretion in allowing an expert witness for the State to testify regarding matters allegedly beyond the scope of his expertise. Intertwined with these points of error, the Appellants also challenge as clearly erroneous certain findings of fact (FOFs) entered by the circuit court on March 18, 2002.

For the reasons discussed *infra* in section III, we hold, on the record before us, that the State is liable to the Appellants as a matter of law. We therefore vacate the circuit court's October 7, 2002 amended judgment and remand for a trial on the issue of the Appellants' damages.

## I. BACKGROUND

### A. The Accident

At approximately 7:00 a.m. on March 9, 1997, on a section of Route 130, located on the island of Hawaiʻi and known as the Pāhoa Bypass, a northbound Subaru being driven by Klink crossed over the center line and into the southbound lane, colliding with an oncoming truck driven by Gordon Souder, killing Klink.

John Silva came upon the accident scene before the arrival of any police and proceeded to a local store to call for assistance. He did not recall seeing any water runoff on the highway.

Officer Martin Ellazar of the Hawaiʻi County Police Department (HCPD), trained in accident investigation and reconstruction, was assigned to the Traffic Enforcement Unit on the morning of the accident and arrived at the scene approximately one hour and fifteen minutes after the accident had occurred. He later testified that, throughout his approximately hour-long investigation, it was raining intermittently, he observed water traveling across the roadway, and he photographed an area "where the water runoff [wa]s up against the berm and the water [was] coming off of the northbound into the southbound lane." Officer Ellazar also observed runoff debris—material deposited both along the lower western portion of the roadway and along the shoulder—which he said was indicative of water flowing across the roadway, but could not estimate when the debris had been deposited. At the time, he did not observe any water flowing from the eastside driveway that fronted the highway at the location of the accident.

HCPD Officer Randall Aurello, who arrived at the scene at least fifteen minutes after the accident, did not observe any water flowing from the east side of the highway and crossing the roadway, nor did he observe any runoff debris on the northbound lane, but he did observe some water running down the southbound lane and the berm on the west side of the road. The water flow did not concern him.

### B. The Highway

Sometime before 1991, the State approved highway designs drafted by a private firm for construction of the Pāhoa Bypass and the accompanying shoulder areas, earthen banks, and driveways in the area of the accident. The State constructed the highway and opened it for traffic in 1991 and has had the legal responsibility to maintain it since then. Howard Haymore, an employee of the State's Department of Transportation (DOT), supervised its construction. The highway runs generally north and south, but the section where the accident occurred turns to the west on a 2000–foot radius curve with a 4.5 percent downhill grade toward the north and an average 2.4 percent superelevation [1] down toward the west. The highway plans included a cutbank on the eastern shoulder and the construction of two driveways in the area of the Klink accident. During the construction process, the shoulder of the road was cut into in order to achieve a uniform slope. Prior to

---

1. Webster's Third New International Dictionary at 2293 (1993) defines "superelevation" as "the vertical distance between the heights of inner and outer edges of highway pavement"; *e.g.,* the banked curve of a racetrack would have substantial superelevation.

the March 9, 1997 accident, there was no drainage system at the site on the eastern shoulder but, in 1998, the DOT installed an interceptor ditch.

## C. *The Lawsuit And Testimony*

On March 3, 1998, the Appellants filed a first amended complaint against the State and the other defendants,[2] alleging, *inter alia:* (1) that the State negligently designed, constructed, and maintained the Pāhoa Bypass, such that the roadway was "deficient, dangerous, and inadequate"; (2) that the State failed to warn motorists adequately of the unsafe condition of the Bypass; and (3) that the State's negligence was the legal cause[3] of Klink's death.

On June 12, 2001, the State filed a motion *in limine* to exclude police reports describing twenty-two prior accidents and five subsequent accidents near the site of the subject collision. The Appellants' counsel partially opposed the motion, seeking to have seven of the reports admitted for consideration by their accident reconstruction expert, Harry Krueper:

> [Counsel]: ... I have no problem ... with the real substance of the motion [to exclude the reports]. It's just that any time any expert analyzes a traffic accident he ordinarily looks at ... incidences that occurred on the roadway. I don't believe ... Krueper is gonna specifically refer to the factors ... involved in other accidents but he would I believe ... say that he looked at the other accidents to determine what other factors may have influenced his investigation. But beyond that I don't think that he's going to say that ... because of an accident that occurred in 1992 he be-

lieves that this particular condition ... is negligent....

> The court: Is he offering an opinion as to negligence?

> [Counsel]: No, ... not negligence, rather it's defective in design; excuse me. But I don't believe he's gonna refer ... specifically to any other accidents. He will say ... that he did look at all other incidences on this particular stretch of roadway to see if there was something there that clued him into what would be a design defect.... [O]ther than that I don't think he'll refer to anything specifically.

> The court: My experience with design is the facts stand on their own and that being its dimensions of angles.

> [Counsel]: That's correct. That is correct, yes. But ... I think any expert looking at whether the roadway is ... defective does consider other incidences that occurred on the roadway, which he certainly did, as did ... [the State's expert, Andrew] Levitt, but he's not gonna specifically say that because of this accident[ ] or because of a factor in another accident that this indicates ... a design defect[ ].

> So I understand.... I really have no objection to the motion with that caveat, Your Honor.

(Some capitalization altered.) The circuit court then granted the motion, noting "with respect to the caveat, I am just wondering if there would be some sort of ... objection as to relevancy ... because I can't see how [the accident reports] would be relevant especially with respect to an expert opinion on design." The police reports that the Appellants' counsel sought to offer into evidence involved seven accidents that occurred prior to March

---

2. The other defendants included Subaru of America, Inc., Souder, and Paul Ogasawara, the owner of the adjacent land that was alleged to be a source of the water. On January 25, 1999, Subaru was dismissed without prejudice by all parties. Claims against Ogasawara were dismissed with prejudice by stipulation on July 7, 1999. All remaining claims against Souder were dismissed with prejudice by stipulation on July 9 and August 10, 1999.

3. "Because we prefer 'legal cause' over 'proximate cause,' we use the former, except when quoting directly from a case." *Taylor–Rice v. State*, 91 Hawai'i 60, 69 n. 6, 979 P.2d 1086, 1095 n. 6 (1999). *See also Montalvo v. Lapez*, 77 Hawai'i 282, 287 n. 5, 884 P.2d 345, 350 n. 5 (1994) ("For our purposes, the terms 'legal cause' and 'proximate cause' are synonymous, although courts should use 'legal cause' instead of 'proximate cause' when instructing juries. *See Knodle v. Waikiki Gateway Hotel*, 69 Haw. 376, 389, 742 P.2d 377, 386 (1987).").

9, 1997 in rainy conditions at the following locations:

| Date of Accident | Distance from Klink's Point of Impact[4] |
|---|---|
| August 7, 1993 | 302 feet north |
| February 17, 1994 | 457 feet north |
| July 29, 1994 | 7392 feet north |
| September 9, 1994 | 0 feet[5] |
| August 25, 1995 | 528 feet north |
| March 3, 1996 | 1056 feet north |
| May 18, 1996 | 528 feet north |

The September 9, 1994 accident report and witness interview states that at 6:50 a.m., in rainy conditions, the driver of a northbound vehicle observed a southbound vehicle cross the center line and enter the northbound lane of travel. The northbound driver successfully avoided a collision by maneuvering onto the shoulder of the highway but observed in her rearview mirror that the southbound vehicle "kept coming into the [north]bound lane," striking the vehicle following directly behind her. The accident occurred in the vicinity of the "Reduced Speed 45 MPH" sign where Klink's vehicle came to a rest on the day of the Klink accident. Aside from a notation indicating "rain" on the report under "Weather Conditions," however, there is no mention made of the road conditions nor of the underlying cause of the southbound vehicle entering the oncoming lane of traffic.

The August 25, 1995 accident report indicates that a southbound vehicle hydroplaned at a curve approximately 530 feet to the north of the Klink accident site, crossed the center line and collided head-on with a northbound vehicle. The remainder of the reports provide few details beyond the fact that the driver "lost control" or "ran off" the roadway.

The circuit court also considered a motion filed by the Appellants to add Travis Henderson–Bell as a critical witness, based on the fact that, on December 4, 1998, Henderson–Bell was involved in a similar automobile accident approximately 920 feet northward from the site of Klink's accident.[6] The Appellants' counsel offered the following justification for adding Henderson–Bell as a witness:

> [Counsel:] [I]t is correct that the accident is not ... at the exact same location.... [And] it is some time later. But what is relevant, Your Honor, is what happened to his car. The weather was substantially similar, [it] was in the early morning hours, it was raining, and, ... the effect that the water had on his car is substantially similar....
>
> The court: Well isn't the relevance substantial[ ] similarity of the conditions ... ?
>
> [Counsel:] Well the problem with that, Your Honor, is that nobody can testify as to the exact water level, the exact amount of rain fallen on the roadway with respect to either of these two accidents. At most I can offer to that is it was raining and it was early morning hours in both accidents. They are located within a ... hundred yards of each other. [A]nd the vehicles both reacted in the same or nearly the same manner.

---

4. The record provides the location of the prior accidents in relation to the eleven and twelve mile markers on the Pāhoa Bypass but, because a review of the circuit court's *in limine* ruling necessitates consideration of the similarity between the prior accidents and Klink's with regard to the section of highway implicated, the locations reported in the accident reports have been translated to fix the site of the Klink accident as the point of reference.

5. The Appellants, in their memorandum in opposition to the State's motion *in limine*, referred to an April 9, 1994 accident but a careful reading of the pertinent accident report reveals that the handwritten police report is dated September 9, 1994 (9/9/94). There is no report pertaining to an April 9, 1994 accident in the record.

6. According to police reports, Henderson–Bell's accident occurred 127 feet south of mile marker 11 on the Pāhoa Bypass, while Klink's occurred 0.2 miles, or 1056 feet, south of mile marker 11. Therefore, although the Appellants maintain that the Henderson–Bell accident occurred in precisely the same location, in front of the same driveway, the evidence in the record, including the Appellant's own memorandum in opposition to the State's motion *in limine*, indicates that Henderson–Bell's accident actually occurred approximately 920 feet farther northward on the highway, at a location significantly outside the area depicted on the scale diagram of the Klink collision.

(Some capitalization altered.) The State sought to exclude all of Henderson–Bell's testimony on grounds of untimeliness and irrelevance. The circuit court orally denied the motion to add Henderson–Bell as a witness, opining that "with regard to Mr. Henderson–Bell, it seems to me that his testimony would lack the necessary foundation for relevance and that foundation would go to the issue of similarity of conditions." [7]

A bench trial commenced on July 23, 2001.

### 1. *Trial testimony of Howard Haymore*

Shortly after the Pāhoa Bypass was completed in 1991, an accident occurred in the area, prompting Haymore to conduct a "[v]ery informal" investigation of the scene. He drove the highway shortly thereafter in heavy rain, however, and observed "water coming over the top of the cut bank" flowing westward across the highway just south of the driveway, but could never determine the source of that flow, because it was his belief that the land on the eastern side of the road sloped away from the highway. The flow of water started south of the eastside driveway and flowed westward across the highway, "cross[ing] both lanes of travel." He did not observe any water flowing from the eastside driveway itself.

Haymore was troubled by what he had observed but "could see no reasonable source" for the water, testifying that "I couldn't figure out how in the world it ever got there to start with.... [I]f I hadn't seen it, I would say that whoever saw it was off the deep end." Haymore discounted the incident as an "anomaly" which he presumed was caused by the adjacent landowner "dumping water on the roadway" and did not observe it again. Although Haymore realized that a repeat occurrence "would be a problem," he did not conduct any further investigations to confirm his theory that the landowner had been dumping water and did not at the time formally report his concerns to the DOT.

Haymore, as a DOT representative, regularly attended meetings of a community traffic organization, the Puna Traffic Safety Council [hereinafter, "the Safety Council"], and recalled at least two specific complaints concerning water traversing the Pāhoa Bypass—one from a private citizen concerning a section of roadway five hundred feet from the site of Klink's accident reporting water traversing the roadway, thereby making driving unsafe, and one from a police officer more generally describing flooding during heavy rainfall at the site of Klink's accident. Haymore asserted that none of the individuals expressing concern about the road's safety could "tell [him] where the water came from" that created the observed sheet flow.

Nevertheless, as a result of citizens' concerns, Haymore was directed twice by his superiors to reinspect the area. His first investigation was conducted on a day when the weather was dry and clear. Haymore testified that his investigations were purely visual: "basically all I did was look at the roadway.... I did not investigate any vehicles or anything else." He further testified that "trying to figure out where the water came from was the big issue" because "[o]ne has to know[:] ... if the water is coming across the entire roadway one inch thick, then I couldn't do anything about it. If it's coming across the roadway one inch thick in a localized area, I can do something about it." He clarified, however, that ascertaining "*[w]here it was coming across* [the roadway] was the *critical* feature." (Emphases added.) In addition to the inspections described in his testimony, Haymore also indicated that, because he was interested in responding to the community's complaints concerning water on the highway coming from the two driveways, he "tried on several occasions when it was raining to run out and check it. ... [but was] unsuccessful [in] find[ing] any water."

Nevertheless, following a second inspection that was prompted by another accident in the area, Haymore recommended that an interceptor ditch be placed on the eastern, high-

---

**7.** On May 10, 2001, Henderson–Bell was deposed in a different lawsuit concerning his acci-

dent.

side of the superelevated curve of the highway to prevent water from flowing across the roadway at the site where Klink later lost control of his vehicle. In an August 1, 1996 e-mail to Bruce McClure, his superior at the DOT, regarding the site, he characterized the need for a drainage facility as "imperative," *see infra.*

On redirect examination, the Appellants' counsel questioned Haymore further regarding the source of the water and the decision to install the interceptor ditch in 1998 based on what Haymore had uncovered in his investigations:

[Counsel]: You've testified that you saw water coming over the top of the bank?

[Haymore]: One time, yes.

[Counsel]: ... And as a result of that, you put the interceptor ditch to stop that from occurring?

[Haymore]: Well, that and people have told me water came down the driveway, so that I would put the interceptor ditch in to try and accumulate any water that might encounter the roadway from the upper side.

[Counsel]: But the interceptor ditch does not extend across the driveways, does it?

[Haymore]: It should dip across the driveways at the ditch.

[Counsel]: If water should be coming across a cut bank in the manner which you've described, Mr. Klink would have encountered that water in the direction in which he was going. He would later have encountered water coming down from the driveway that enters onto Route 130 just north of ... where the cut bank would be?

[Haymore]: The driveway was north of where I saw the water.

[Counsel]: So you're aware of two possible sources of water coming onto the high side of that super elevation curve which would then flow all the way across the roadway?

[Haymore]: I can say I only feel there's one source of water, and that would be the driveway.

Finally, Haymore testified that, pursuant to applicable safety standards, signs warning of flooded road conditions should be placed "about five hundred feet in front of the occurrence."

### 2. Testimony of McClure

McClure was employed as the DOT's district engineer for Hawai'i County from April 1996 through June 1997 and had overall responsibility for administration of the Pāhoa Bypass. McClure testified that, even when road construction standards are met, a state engineer who notices a dangerous condition on the highway should alert the department so that necessary remedial actions could be taken and McClure would have expected Haymore to have done so.

Beginning in April or May 1996, McClure began attending meetings of the Safety Council, where he received complaints from citizens and police officers about water crossing the Pāhoa Bypass. In response, he ordered his staff to review accidents that had occurred in the vicinity. After his staff informed him that more than one wet-weather accident had occurred near the location, he recommended that warning signs immediately be installed a quarter of a mile northward and southward of the site of the water flow because water crossing the roadway would create a dangerous and unexpected condition. McClure's department considered the "intermediate measure" of grooving the pavement but, McClure testified, "the best measure is always to try to get the water at its source and not have it cross the road, if possible."

At the request of the Appellants' counsel, McClure then read into the record part of the August 1, 1996 e-mail from Haymore: [8]

comes over the top of the cut bank and runs across the superelevated roadway. The northbound truck that hydroplaned shortly after the completion of this project had bald tires that appear to be under inflated. This was considered to be the primary cause of this accident at the time although there was an unusual

---

8. The August 1, 1996 e-mail refers to a memorandum Haymore wrote, dated September 21, 1995, which read in relevant part:

**Subject: Accident on the Pāhoa Bypass at the 11.1 MP**

[T]he Pāhoa Bypass has had problems about 500 feet further towards Kapoho where water

The other two accidents were probably caused by the water the greenhouse dumps over the top of the cut bank on the high side of the superelevated curve. This is not a new phenomenon but I did not realize it was a problem. About the only cure for this is to put a drainage facility on the high side of the super.... Possibly a gutter would work, but the slope on the low side of the super shows evidence of heavy water flow which would suggest a ditch on the top of the cut bank. My memory of the right of way in this area suggests that we do not have adequate room for a ditch on the top of the cut bank. This leads me to conclude that it may be necessary to move the top of the cut bank back to the right of way so as to widen the area available for the largest possible gutter. From the accident records it is imperative that we make some sort of drainage facility. Perhaps you should add this to my list of desirable projects.

On the memo, in response, McClure wrote the following message: "How about installing a 'Road Floods During Rain' sign now[?] And how much would it cost to groove the road (to mitigate any hydroplaning, if it occurs,) until [we] could build an interceptor ditch[?]"

### 3. *Further testimony of Officer Ellazar*

Officer Ellazar testified that, before the Klink accident, he frequently traveled the subject area and observed the roadway under a variety of weather conditions and, on several occasions, during "light rain, medium, to heavy downpour" had observed water coming off the cutbank on the east side of the road in the location where the accident occurred and flowing across the roadway, onto the northbound lane and then further onto the southbound lane with "not much variance" in the flow regardless of the intensity of the rainfall. He further testified that,

amount of water on the roadway.... Unless there is another unknown source of water such as water coming down the homestead road just northwest of the accident site it is difficult to see how any undue amount of water could be on the roadway or how the roadway surface could be unusually slick. The cinder slope behind the guardrail on the southbound lane shows considerable signs of erosion past the

one evening during a heavy rain storm, he had almost lost control of his own vehicle due to water sheeting across the roadway.

### 4. *Testimony of Lieutenant James Kelly*

HCPD Officer Lt. James Kelly attended the Safety Council meetings and recalled citizens expressing concerns specifically involving water conditions on the Pāhoa Bypass near the eleven mile marker, the same area where Klink's accident occurred. Kelly testified that at least one DOT representative was present at each meeting, normally Haymore or McClure. In addition to the other complaints, at one meeting, the Safety Council's leader directly addressed the state representative and demanded that an investigation be undertaken of the particular stretch of highway.

Lt. Kelly testified that he was disquieted by the citizens' concerns and that he twice undertook his own investigations of the subject area. He made it a point to inspect the highway during different levels of rainfall and testified that "[t]he depth of the water was significant on the heavy downpour time." In fact, both regular rain conditions and a heavy downpour created a similar water pattern:

[A]s the road is level and starts to curve and go down that the water would stay within the roadway and would follow the curve and follow the downward pattern of the roadway. It would sheet from that particular area, makai to mauka, [east to west, northbound to southbound lanes] inside corner, and then diagonally cross the road. There would be a noticeable sheet during the curve in the down sweep of the water running broadly across the road to the inside.

The water would completely cross the roadway at that time. Lt. Kelly discussed his

area where the water from the top of the cut bank would flow down the embankment. The source of this water is not clear. It is also not obvious if the erosion is caused by more than the local runoff of the roadway. Unless more information becomes available there appears to be no justification for any change to the roadway.
(Format altered and kahak added.)

observations and concerns at length with a state representative. An employee of the DOT's Highways Division reported to the Safety Council that an investigation of the site revealed no problems with water on the roadway. Lt. Kelly "got a little strong at that point" and asked the representative if the State could groove the roadway, but "[a]gain they said it wasn't a problem."

Lt. Kelly was part of the investigative team that responded to the Klink accident. He recalled observing water running along the gutter located on the west side of the road. Based on the debris line at the gutter, he concluded "that water [had been] there at a much higher level than when I got there." Lt. Kelly did not recall any running water or debris on the east side of the road, nor did he recall observing any water running off the east driveway or property.

### 5. *Testimony of Krueper*

Krueper testified for the Appellants as a traffic and civil engineer specializing in highway and accident reconstruction. He testified that, based on his measurements of the Pāhoa Bypass and its surrounding landscape, water runoff would travel across the roadway any time it rained. He noted that it was standard practice in roadway design to intercept water entering the roadway "offside from the hill, from the dirt shoulder" and channel it along the outside edge of the road. Krueper believed that the interception capabilities of offside water at the site of the accident were inadequate. During a visit to the scene for his report, Krueper also observed water coming off the driveway and "sheet flowing across the road" while it was drizzling, although later, on cross-examination, he confirmed that he had not observed any other runoff during that inspection. He testified that the State should have constructed a dip at the bottom of the driveway to prevent water from entering the roadway. Ultimately he concluded that a film of water on the roadway resulted in a loss of traction to Klink's vehicle, causing the accident, in part based on observed water flow and debris and in part based on the dynamics of the accident, asserting that "there's no way a person can turn that sharp on dry pavement without rolling over." He emphasized that

he did not believe that true hydroplaning—or a complete loss of contact between the tires and the road surface—caused Klink's vehicle to follow the trajectory that it did but, rather, that the trajectory of the vehicle indicated that contact with the roadway was only partially lost, "caused by a film of water being on the roadway's surface" and further causing the rear of Klink's vehicle to swing around toward the front in a counter-clockwise direction as the lighter rear end failed to brake as effectively as the heavier, front end of the vehicle when Klink entered the downhill-sloping superelevated curve. He also testified that, based on his analysis of the vehicle, the condition of Klink's tires did not play a role in the accident.

With regard to the sufficiency of the roadway's design, Krueper stated that broad standards of roadway construction cannot substitute for an engineer's professional judgment based on particular on-site conditions. He testified that a basic principle of road construction is dewatering the roadway before a driver enters a superelevation. In his opinion, the design of the Pāhoa Bypass did not demonstrate "professional engineering judgment" because there was no drainage for uphill water. Accordingly, in Krueper's opinion, the lack of a feature, such as a ditch, to intercept the water from the land abutting the highway before it reached the road rendered the design of the highway defective.

Krueper opined that, if the supervising engineer had observed water flowing onto the roadway from the shoulder shortly after the highway had opened, he should have investigated to ensure that the highway had been built according to design specifications. Krueper further testified that the engineer should then have notified a supervisor of the condition, warning signs should have been installed, and methods to intercept the water should have been undertaken immediately. In Krueper's opinion, Haymore's failure to take action when he first observed water coming over the cutbank in 1991 was a deviation from professional and ethical standards.

Krueper also testified that warnings signs should be placed "far enough in advance of

the object that you are to warn of so a driver can reasonably perceive, react, and do what the sign intends to tell you to do before you get to that point." Specifically, pursuant to DOT guidelines, in Krueper's opinion the appropriate location for a sign warning of flooding would be at least 450 feet prior to the condition, 500 feet if the roadway was downhill, which for the present matter would be approximately 50 feet south of station 0+00 on Exhibit 27. Krueper believed that the "Road Floods During Rain" sign he observed during his site inspection, located roughly at station 3+00 on Exhibit 27—approximately 100 feet south of where Klink's car began its spin, and approximately 350 north from the location Krueper believed it *should* have been located to provide adequate warning—was nevertheless not present on the day of the Klink accident because it appeared to be brand new and there was no mention of it in the police report.

### 6. *Testimony of Ellison Ancheta*

Ellison Ancheta, as supervisor for a DOT traffic services crew, was tasked with installing the "Road Floods During Rain" signs. He testified that the two signs, one for each direction of travel, were erected on August 7, 1996 and that the sign for the northbound lane was placed at least 600 feet before the spot where Klink's car began its skid. However, Ancheta conceded that he had not personally witnessed the installation of the northbound sign, but had only received oral confirmation from his work crew that it had completed the work, which had been assigned to it on the same day via a written DOT work order;[9] the oral confirmation and the fact that, upon the crew's return, the posts and signs were not present, led Ancheta to conclude that the crew had installed the signs.

Ancheta confirmed, however, that the August 7, 1996 work order had called for the sign for northbound traffic to be installed approximately 250 feet farther north than it was, toward the site where the accident occurred, at a location where an "intersection ahead" sign was already located. Only after the Klink accident did he discover that the sign had, in fact, been installed farther south, when a report on the accident was issued and a state official had notified him that the sign was in the more southern location. He questioned his crew about the misinstallation and was informed that, because the "intersection ahead" sign was already located at the called-for coordinates, his crew had made a judgment call to install the "road floods" sign farther south, where Ancheta personally observed it during a site visit following Klink's accident.

The Appellants objected to the testimony, arguing that Ancheta had no personal knowledge of the installation or location of the sign until after the accident and, hence, that his testimony, which was elicited to establish the existence and location of the warning sign on the day of the accident, constituted inadmissible hearsay. The circuit court allowed the State to continue its questioning, however, in order further to establish the foundation of Ancheta's knowledge. The circuit court then asked Ancheta to identify on Exhibit 27—the diagram of the accident site prepared by Krueper—(1) the location where the work order called for the sign to be placed and (2) the location where his crew had actually placed the sign on August 7, 1996. Ancheta then testified, referring to a March 27, 1997 daily maintenance report (DMR) introduced into evidence, that, following Klink's accident, the sign was moved to the second location nearer the east side driveway where it was subsequently observed by Krueper during his site inspection. The circuit court allowed the report into evidence, over the Appellants' counsel's objection that "it does not identify the sign that was moved [or] where that sign was located," arguing that "[t]here is nothing to show that this document is related in any fashion to the sign which is [the] subject of the inquiry." The circuit court thereafter made the following comments:

> [T]his is what I'm hearing and I'm going to share this right now with everyone on the record—[Ancheta] remembers the accident maybe, not by date or time, but because it caused someone to tell him "You got a sign

9. A DOT work order assigns work to be completed on a given day, whereas a daily maintenance report, *see infra,* reports what work has been completed on a given day.

in the wrong place, go out and change it." He went out to look for himself, he saw the sign in the wrong place. He told us where he [had] seen that sign, which is about 250 feet ... to the right of where [Exhibit 27] ends. Now the only thing that we need to ascertain is the number of feet from the intersection sign to the end of the diagram. And my estimation is about 180 feet....

The Appellants further objected to the propriety of Ancheta referring to a work order not in evidence in testifying where the sign was originally installed. The circuit court responded that much of the confusion stemmed from the failure of either party to depose Ancheta prior to trial:

[Appellants' counsel:] Well, Your Honor, I'm troubled by the fact that this witness obviously relied on documents for his testimony.... They've never been identified in this case up until today. And then they're not produced. And I think that is highly irregular.

[The Court:] I don't know what you are talking about.

[Appellants' counsel:] The work order that he's referring to for example.... [T]hat he looked at to determine the date. That's not in court. We've never seen it. It's never been identified.

[The Court:] The point is what? You wanted the work order to determine the date of the accident or something else?

[Appellants' counsel:] Well, no. I just think that they have an obligation to bring these documents if this witness is going to testify....

[The Court:] Well if we're going to talk about obligations and what we know and don't know then we are going to get to the issue of why [Ancheta]'s deposition was not taken. So I'm not going there. You do what you have to do, but don't mess up the witness, confuse him, confuse me, mess up the facts. Please, we're just trying to get clarity.

Ancheta continued his testimony based upon the DMRs and his recollection of pertinent work orders that he had reviewed prior to trial.

### 7. Testimony of Francis Nishioka

As the DOT's head of the hyrdraulics design section, Francis Nishioka was charged with managing water runoff on the State's highway system, including standards compliance and drainage construction. He testified that, after three visits to the site and a review of all the relevant depositions and design plans, including pre-construction topographical maps, in his expert opinion the design of the highway met all criteria, including those pertaining to drainage, and was safe. He contested Krueper's expert opinion that custom and practice would have called for a drainage feature on the upper side of a superelevated highway—in the present matter, the east side of the road—by testifying that the topographical map he reviewed [10] indicated that water could not flow toward the road, "[a]nd ... since rainwater does not flow toward the road the cut-off ditch is not required." He furthered testified that, based on his reading of the pre-construction topographical map, water from the cut-bank directly fronting the highway would be "very minimal" and that the bulk of any water falling on the driveway would flow not onto the highway but would instead flow parallel to it into a gulch northward of the driveway. On cross-examination, however, Nishioka conceded that the actual topography of the site could have been altered by the construction process; Nishioka further conceded that, if Haymore had observed "water coming off this cut bank flowing onto the roadway in this area and crossing the roadway," then there would be a dangerous condition. Nishioka contended that if the water originated from a private source, such as a greenhouse, then it would not be the DOT's responsibility to design for or address the problem; he admitted, however, that he was unaware of any investigation to determine the ultimate source of the water coming off of the cutbank and further testified that his department had not received any notification that water was crossing the highway until after Klink's accident. He was also unaware of any subse-

---

**10.** The topographical map relied upon by Nishioka was entered into evidence as Defendant's Exhibit 12 but is missing from the exhibits provided to this court as part of the record on appeal.

quent determination of the source of the water but confirmed that his department oversaw the installation of the interceptor ditch. He further conceded that the map upon which he was relying did not contain measurements of the slope of the roadway or the driveway and that, based on the measurements actually conducted by Krueper, rainwater either falling on the driveway or running parallel down the shoulder onto the driveway would eventually run onto the highway, at least at higher volumes of water.

### 8. *Testimony of Danielle Alejandro*

According to her testimony, Danielle Alejandro [11] was "tailgating"—as close as one-half of a car length—behind Souder's vehicle when Klink's vehicle crossed the median strip and collided with Souder, but she was able to maintain control of her vehicle and avoid the collision. Alejandro testified that it was "pouring" rain leading up to and at the time of the accident and that Souder's vehicle was moving so slowly that she attempted to pass it several times but that "it was pouring so hard that I was afraid to." She recalled water running on the roadway. On cross-examination, however, she also indicated that she did not see any water coming from the driveway or the grassy area along the northbound lane. In response to the confusion concerning Alejandro's testimony regarding water flow, the Appellants elicited the following testimony on redirect:

Q: What you do recall, though, is that it was raining, and it had been raining hard since the time you got onto [the Pāhoa Bypass]?

A: Yes.

Q: And water was running on the roadway on both sides of the roadway at the accident scene?

A: I don't remember if it was running [on] both side[s], but I know—

Q: Water was running on the roadway?

A: Yes.

### 9. *Testimony of Souder*

In contrast to Alejandro's testimony, Souder maintained that, while it had rained earli-

er that morning, it was not raining at the time of the accident and he did not believe Alejandro's vehicle was following him particularly closely. He did not recall Alejandro's vehicle ever attempting to pass him. He became aware of Klink's vehicle when it was "[v]ery, very close . . . [w]hen it took a sudden swerve into my lane of traffic." He recalled that Klink's vehicle "took a slight jog to the right and then an immediate hard turn to the left." At the time Klink executed that maneuver, Souder insisted that there were no vehicles to his immediate left; to wit, no vehicle attempting to pass Souder; accordingly, Souder had no explanation as to why Klink drove as he did. He remembered Alejandro's vehicle passing through the accident scene immediately afterward.

### 10. *Testimony of Andrew Levitt*

Andrew Levitt, the State's accident reconstruction expert, testified that, based on a review of the physical evidence and photographs of the accident, it was his expert opinion that the accident was not caused by hydroplaning but, rather, by Klink's attempts to avoid an unknown vehicle entering his lane of travel. He reasoned that, if Klink's vehicle had hydroplaned, denying Klink steering control, his vehicle would have continued northward in a straight trajectory until the roadway curved away toward the west and out from underneath it, sending the vehicle onto the east side shoulder. Levitt maintained that, in order to execute the maneuver that it did—a radical change in the direction of the vehicle from northward to northwestward—the vehicle's tires would have had to have remained in contact with the pavement, making steering input possible. He asserted that the turn and rotation of Klink's vehicle, as diagramed by Krueper, was not possible solely within the northbound lane of travel, that, in order to produce the evidence gathered at the accident site, Klink's vehicle would of necessity have first been steered eastward onto the northbound shoulder before turning westward across the highway, into the oncoming, southbound traffic, and that that maneuver required some degree of contact between the vehicle's tires and the

---

**11.** Danielle Alejandro appears in some of the record as Danielle Midel, her maiden name.

roadway. He theorized that the vehicle driven by Alejandro had attempted to pass Souder's vehicle by entering the northbound lane, presenting Klink with the need to steer right, onto the shoulder, and then left, back onto the roadway, and to apply his brakes, thereby resulting in the accident. He maintained that, Alejandro having admitted tailgating the Souder vehicle and given the human reaction time necessary to avoid the collision, it was "simply not possible" for her to avoid becoming part of the accident without either being much farther behind the Souder vehicle than she claimed or "off in the northbound lane in a passing mode." Levitt reviewed Krueper's testimony and contested Krueper's reconstruction, maintaining that it did not reproduce the rotation necessary to place Klink's vehicle where it was when it struck Souder's truck.

On cross-examination, Levitt conceded that neither Souder nor Alejandro had testified that Klink's vehicle ever left the roadway. He also conceded that the police had not observed any tire marks on the pavement or the paved shoulder; he asserted, however, that it would not be uncommon, given the wet conditions, for a vehicle in such a scenario to fail to leave discernible marks. On the other hand, he conceded that if Klink's vehicle had lost traction in its rear wheels, perhaps due to water on the roadway, the rear of his vehicle would have drifted slightly to the right, which, in turn, could have caused Klink to overcorrect to the left, bringing him into the oncoming lane of traffic. Nevertheless, Levitt maintained that such a scenario would presuppose either that Klink was "inattentive" or that he was "grossly overreacting to a stimulus."

### 11. Testimony of Dr. John Dracup

Dr. John Dracup testified for the State as an expert in hydrology and hydraulic engineering. Relying on police photographs taken of the area on the day of Klink's accident, he opined that the shoulder sloped away from the roadway on the eastern side of the highway. The Appellants objected to this testimony as exceeding the scope of Dr. Dracup's expertise, but were overruled by the circuit court. Dr. Dracup's analysis did

not rely on any independent survey of the topography of the site. Relying on Krueper's measurements of the site and meteorological data of the rainfall in the area during the morning of the accident—which reported 0.19 inches of rainfall in the hour before the accident—Dr. Dracup opined that, even assuming all 0.19 inches fell in a sudden deluge, the water would drain completely from the roadway within fifty-four to eighty-five seconds. He conceded on cross-examination, however, that he did not include the driveway area in his calculations. The Appellants' counsel then asked Dr. Dracup to refer to photographs Dr. Dracup had taken in the course of his field investigation of the accident site. Dr. Dracup confirmed the photos were taken two hours after a light rain had fallen. He conceded that the photos exhibited water on the highway, water continuing to drain down the driveway, and water continuing to flow down the interceptor ditch, constructed subsequent to the accident, along the eastern shoulder.

### D. The Circuit Court's FOFs And Conclusions Of Law (COLs)

Prior to closing arguments, the circuit court stated:

I'm very concerned and troubled by the notice that was given to the [DOT]. There's no question they knew that something was wrong in that area. And their own officials went to these meetings. Police officers testified that they were present at these meetings before this accident occurred by at least ... conservatively a year-and-a-half to two years.

So that's what bothers me. That they had this notice that is was a dangerous condition. They had notice that it was a fatal condition, actually, in one situation as I think investigated by Mr. Haymore. And they didn't do anything. And it was because they went there and couldn't figure out how the water had accumulated. But they couldn't deny that the water was there. All these people were telling them that the water was there. So it's very troubling to me. And I think the law is that the State has a duty.

Following closing arguments, *inter alia*, the circuit court orally issued the following FOFs and COLs:

> I also find that the source of the water on the roadway, however, has not been proven. And that even today there is no evidence of the source of that water. And the source is critical to the fix. Can't stop a flow if you don't know how and where to turn it off.
>
> The Court finds that the State has a duty to design and construct its highway in a manner so as to make it reasonably safe for intended use. There is no proof that the design or construction of this highway and that area was unsafe.
>
> The Court also finds that the State has a duty to maintain the highway and to inform the public of the existence of any highway defects.
>
> The Court finds that the activities of the State show the State fulfilled its duty to investigate, to put up signs, and therefore there is no breach of that duty in this case.

The circuit court instructed the State to prepare written FOFs and COLs. On March 18, 2002, the circuit court entered, *inter alia*, the following written FOFs and COLs:[12]

### FINDINGS OF FACT

. . . .

B. *Investigation of Water Overflow*

10. About two weeks after the Pāhoa Bypass opened in 1991, Mr. Haymore noticed water flowing over the top of the earthen cut bank on the east side of the ... Bypass. The water concerned Mr. Haymore ever since.

11. Also about two weeks after the Pāhoa Bypass opened, Mr. Haymore became aware of a truck accident that happened ... where he saw the water overflow the cut bank.

12. Mr. Haymore was a regular attendee of the Puna Traffic Safety Council. He first recalled community concern about hydroplaning accidents on the Pāhoa Bypass about three months after the Nakano–Hutchinson accident on August 25,

1995, which reportedly occurred 0.1 miles south of the 11 Mile Marker.

13. *At one of the meetings, Mr. Haymore spoke with a uniformed police officer who told him that there was water consistently all over the road at the Pāhoa Bypass.*

14. Mr. Haymore went to the Pahoa Bypass twice to investigate it.

15. *In a September 21, 1995 memorandum, Mr. Haymore noted that the "Pāhoa Bypass has had problems about 500 feet further towards Kapoho where water comes over the top of the cut bank and runs across the superelevated roadway." However, Mr. Haymore stated "the source of this water is not clear."*

16. In April 1996, Bruce McClure, P.E., became the district engineer for the .. DOT ..., Hawai'i District. He managed all State Highways for the entire Big Island.

17. *In April 1996, Mr. McClure attended a meeting of the ... Safety Council where citizens expressed concern that there was a fatal accident on the Pāhoa Bypass where there had been previous accidents due, they believed, to excessive water on the roadway.*

18. *Mr. McClure investigated the accident site and concluded that several of the accidents occurred in wet weather.*

19. *Mr. McClure concluded that water might contribute to problems experienced by motorists traveling the Pāhoa Bypass.*

C. *Corrective Measures*

20. *On August 1, 1996, Mr. Haymore wrote a memorandum stating that it was imperative that a drainage facility be installed at the Pāhoa Bypass, such as an interceptor ditch on the high (east) side of the superelevation.*

21. On August 2, 1996, Mr. McClure suggested installing "Road Floods During Rain" signs, and investigating grooving the road surface until an interceptor ditch could be built.

22. Pursuant to the guidelines of the Hawai['i] Statewide Uniform Design Manual, that warning sign should be placed

---

**12.** The Appellants challenge the FOFs and COLs that are set forth in bold.

approximately 500 ft. before the dangerous condition of which it warns.

23. **A work order was issued, ordering installation of the warning sign at the 11.18 mile marker, which is approximately 200 ft. south of the dangerous condition of which it was supposed to give warning, contrary to the guidelines of the Highway Statewide Uniform Design Manual.**

24. . . . Ancheta was foreman of the crew responsible for the placement of highway signs on the Big Island.

25. Ancheta ordered three members of his crew to place the sign in that location. The crew later reported back that they had placed the sign, but Ancheta did not perform any inspection to determine if or where the sign was placed. Ancheta had no personal knowledge of where or when the sign was in fact placed, until some months following the Klink accident.

26. Ancheta testified that some months after the Klink accident, he was told orally, by somebody working for the State Highway Department, that the sign had not been placed where it had been designated.

27. **Ancheta testified that upon receiving that notification, he went out to the sign and learned that the sign was not placed where it had been designated, but was instead placed approximately 500 ft. further down the road in a southerly direction.**

28. Ancheta admitted that the State maintains an up-to-date diary which should include the date of installation of all highway signs, and if a sign is placed somewhere other than originally designated, the reason for placing the sign in another location. No such document was produced by the State, nor entered into evidence in trial.

29. After speaking with his crew, and personally going to the scene, Ancheta decided to move the sign back to where it was originally designated.

30. Mr. Ancheta further testified that he did not speak with anyone at the office of the State Attorney General about the original placement of the sign in the wrong location, nor the subsequent relocation of the sign, until shortly before trial.

31. There were no documents introduced by the State at trial, which indicate or show that the sign was not placed where originally designated, at Mile Marker 11.18. There were no documents, such as the State Highway sign diary, introduced to show where the sign was in fact placed, nor giving the reason why it was placed in its location.

32. **According to State Department of Transportation traffic crew supervisor . . . Ancheta, on August 7, 1996, the sign was[,] for Hilo bound drivers[,] placed more than 500 feet south of where Mr. Krueper testified that Mr. Klink would encounter excess water on the Pāhoa Bypass.**

D. *Subject Accident Occurred on March 9, 1997*

33. Throughout the morning of March 9, 1997 (the "accident date"), the Pāhoa Bypass area was subjected to intermittent rain showers alternating between light and heavy intensity.

34. **The surface of the Pāhoa Bypass roadway was wet and there was excess water in the vicinity of the Klink accident. However, the source of the water was unknown.**

35. At approximately 7:00 a.m. on the accident date, . . . Klink . . . was driving northbound on the Pāhoa Bypass, between Mile Markers 11 and 12. . . .

36. *Mr. Klink was driving 35 to 40 miles per hour.*

37. *As Mr. Klink drove northbound and approached the southernmost driveway on the east side of the Pāhoa Bypass Road, he was driving 25.2 miles per hour, applied his brakes and lost control of his vehicle.*

38. Mr. Klink's vehicle spun in a counterclockwise direction and slid into the southbound travel lane. As it did so, it was struck on the right rear quarter-panel by . . . a pick-up truck . . . driven . . . in the southbound travel lane by . . . Souder. . . .

39. Danielle Midel–Alejandro was the driver of a vehicle driving southbound immediately behind Mr. Souder at the time of the accident.

40. Christopher Derasin, a passenger in Midel–Alejandro's vehicle, testified that it was drizzling at the time of the accident.

41. Mr. Souder said it was not raining at the time of the accident. Neither of them saw water flowing on the road.

42. Ms. Midel–Alejandro testified that it was raining "very hard" at the time of the accident. She described water running across the roadway at the scene of the accident. However, she could not say where the water was coming from.

43. **Martin Ell[a]zar is a Hawai['']i County Police officer, and was one of the investigating officers that came to the accident scene more than one hour after the accident had occurred. He observed runoff going in a westerly direction across both lanes of travel, and collecting at the berm on the west side of the roadway. However, he stated that the runoff did not concern him at the time. He saw no runoff debris from the east properties[,] cut bank[,] or driveway on the road.**

44. **Lt. James Kell[ ]y is a member of the Hawai['']i County Police Department. He arrived at the accident scene when the vehicles and parties were still present. He saw no runoff debris from the east properties, cut bank[,] or driveway on the road.**

. . . .

47. Harry Krueper, P[.]E., plaintiffs' expert highway design engineer and accident reconstructionist, rendered opinions based upon a reasonable degree of probability in his fields of expertise.

48. The speed limit for Mr. Klink at the time of the accident was 55 miles per hour.

49. There was no form of drainage at the place where Mr. Klink lost control of his vehicle, about 120 feet south of the collision site.

50. *Runoff created sheet flow where Mr. Klink lost control of his vehicle.*

51. *If a driver applied his brakes where the sheet flow occurred, there would be a very strong potential of reduction in friction on the roadway surface.*

52. *Reduced or loss of friction would cause the back end of the northbound vehicle to turn the vehicle in a counterclockwise direction and follow the superelevation slope of the roadway into the southbound lane.*

53. *When there is banking or superelevation of a highway, custom and practice requires placement of an interceptor ditch at the edge of the shoulder to capture water running off adjacent slopes and driveways.*

54. *The Klink vehicle went into its counterclockwise spin when, as Mr. Klink was traveling northbound at approximately 25.2 miles per hour, he reasonably applied his brakes to maintain his speed or to avoid some peril.*

55. *Mr. Klink applied his brakes as he approached the southernmost driveway such that the rear tires of his vehicle lost contact with the roadway when it came upon sheet flow causing it to spin counterclockwise and into the path of the vehicle driven by Mr. Souder.*

56. *The accident was caused by water on the roadway in sufficient magnitude to make it very slippery and cause loss of traction.* This would have been enhanced by braking and possibly steering input.

57. **However, the source of the water on the road had not been proven. Further, the source of the water is critical to any remediation.**

E. *1998 Drainage Improvement Project*

58. In 1998, the State installed an interceptor ditch between the eastern shoulder of the Pāhoa Bypass and the cut bank which sloped down to the shoulder. [13]

13. It should be noted that, at trial, the State did not challenge the admissibility of the post-accident installation of an interceptor ditch along the eastern shoulder of the highway.

## CONCLUSIONS OF LAW

1. The State has a duty to design and construct its highway in a manner so as to make it reasonably safe for intended use. There is no proof that the design or construction of the Pāhoa Bypass and the area of the subject accident was unsafe.

2. The State has a duty to maintain its highway[s], and to inform the public of the existence of any highway defects. The activities of the State show that the State fulfilled its duty to investigate, and to install signs, and therefore, it did not breach its duty.

3. There is insufficient proof that the State's negligence was a substantial factor in causing Plaintiff's injuries.

(Emphasis and kahakō added.) On October 7, 2002, the circuit court filed its amended judgment as to all claims in favor of the defendants. The Appellants' timely appeal followed.

## II. STANDARDS OF REVIEW

### A. FOFs And COLs

■■■ The [circuit] court's ... FOFs ... are reviewed on appeal under the "clearly erroneous" standard. [*In re Jane* ] *Doe*, [*Born on May 22, 1976* ], 84 Hawai'i [41,] 46, 928 P.2d [883,] 888 [ (1996) ] (citing *State v. Naeole*, 80 Hawai'i 419, 423 n. 6, 910 P.2d 732, 736 n. 6 (1996)). A FOF "is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citation omitted). " 'Substantial evidence' ... is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (quoting *State v. Wallace*, 80 Hawai'i 382, 391–92, 910 P.2d 695, 704–05 (1996)); *see also State v.*

*Kotis*, 91 Hawai'i 319, 328, 984 P.2d 78, 87 (1999).

*In re Jane Doe, Born on June 16, 1994*, 101 Hawai'i 220, 227, 65 P.3d 167, 174 (2003).

*Troyer v. Adams*, 102 Hawai'i 399, 409–10, 77 P.3d 83, 93–94 (2003) (some brackets added and some in original).

" 'A COL is not binding upon an appellate court and is freely reviewable for its correctness.' " *AIG Hawaii Ins. Co. v. Estate of Caraang*, 74 Haw. 620, 628, 851 P.2d 321, 326 (1993) (quoting *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 119, 839 P.2d 10, 28 (1992)). This court ordinarily reviews COLs under the right/wrong standard. *In re Estate of Holt*, 75 Haw. 224, 232, 857 P.2d 1355, 1359 (1993). Thus, " '[a] COL that is supported by the trial court's [FOFs] and that reflects an application of the correct rule of law will not be overturned.' " *Estate of Caraang*, 74 Haw. at 628–29, 851 P.2d at 326 (quoting *Amfac, Inc.*, 74 Haw. at 119, 839 P.2d at 29). "However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case." *Id.* at 629, 851 P.2d at 326 (quoting *Amfac, Inc.*, 74 Haw. at 119, 839 P.2d at 29) (internal quotation marks omitted).

*State v. Furutani*, 76 Hawai'i 172, [180], 873 P.2d 51, [59] (1994).

*Allstate Ins. Co. v. Ponce*, 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004). (Some brackets and internal citations omitted.) (Some bracketed material altered.)

*Thompson v. Kyo–Ya Co., Ltd.*, 112 Hawai'i 472, 474, 146 P.3d 1049, 1051 (2006) (some brackets in original).

### B. Admission Of Evidence Of Other Incidents To Prove The Existence Of A Dangerous Condition

■■■ [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue.

When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard.

*Kealoha v. County of Hawaii,* 74 Haw. 308, 319, 844 P.2d 670, 676 ... (1993). Where the evidentiary ruling at issue concerns admissibility based upon relevance, under ... [Hawai'i Rules of Evidence ( )HRE[ )] ... Rules 401 and 402, the proper standard of appellate review is the right/wrong standard. *See State v. Toro,* 77 Hawai'i 340, 347, 884 P.2d 403 ... (1994).

*State v. Kupihea,* 80 Hawai'i 307, 314, 909 P.2d 1122, 1129[ ] (1996) (some brackets in original and some added). "Evidentiary decisions based on HRE Rule 403, which require a 'judgment call' on the part of the trial court, are reviewed for an abuse of discretion." *Walsh v. Chan,* 80 Hawai'i 212, 215, 908 P.2d 1198, 1201, (1995) (citing *Sato v. Tawata,* 79 Hawai'i 14, 19, 897 P.2d 941, 946 (1995)).... " 'The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.' " *State v. Ganal,* 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996) (quoting ... *Furutani,* 76 Hawai'i [at] 179, 873 P.2d [at] 58 ...).

*Tabieros v. Clark Equip. Co.,* 85 Hawai'i 336, 350–51, 944 P.2d 1279, 1293–94 (1997) (quoting *State v. Arceo,* 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996)).

C. *Qualifications And Testimony Of Expert Witnesses*

 [I]t is not necessary that the expert witness have the highest possible qualifications to testify about a particular manner, ... but the expert witness must have such skill, knowledge, or experience in the field in question as to make it appear that his opinion or inference-drawing would probably aid the trier of fact in arriving at the truth.... Once the basic requisite qualifications are established, the extent of an expert's knowledge of subject matter goes to the weight rather than the admissibility of the testimony.

*State v. Wallace,* 80 Hawai'i 382, 419 n. 37, 910 P.2d 695, 732 n. 37 (1996) (brackets and ellipsis points in original) (emphases omitted). " 'Whether expert testimony should be admitted at trial rests within the sound discretion of the trial court and will not be overturned unless there is a clear abuse of discretion.' " *Id.* at 406, 910 P.2d at 719.

*Tabieros,* 85 Hawai'i at 351, 944 P.2d at 1294.

## III. *DISCUSSION*

The Appellants generally contend that, because the circuit court found (1) that a "dangerous" and "fatal" condition of excess water on the highway developed during a period of rainfall and (2) that Klink's accident was caused by "excessive water" on the roadway, and because (3) the evidence adduced at trial demonstrated that the State had more than adequate notice of the dangerous condition, the circuit court erred in concluding that the State was not liable for Klink's death. More specifically, the Appellants contend: (1) that the circuit court erred in finding that, on March 9, 1997, a warning sign was posted at least 500 feet before the site of the accident; (2) that the circuit court abused its discretion in excluding evidence of prior and subsequent accidents; and (3) that the circuit court erred in concluding that the State had fulfilled its duty to design, construct, and maintain the highway for reasonably safe use and to warn of any hazards.

A. *The Circuit Court Did Not Clearly Err In Finding That The Sign Was Posted At Least 500 Feet South Of The East Driveway On The Day Of The Accident.*

The Appellants contend that the circuit court clearly erred in finding that, on the day of the accident, a "Road Floods During Rain" sign was posted at least 500 feet southward of the scene of the accident.

 It is well settled that the trial judge, sitting as the trier of fact, is "free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence." *State v. Batson,* 73 Haw. 236, 249, 831 P.2d 924, 931 (1992). Disre-

garding Ancheta's testimony regarding any hearsay statements made by members of the work crew originally charged with installing the sign (to which the Appellants objected at trial and which underlie their challenge of FOF Nos. 27 and 32), the following evidence pertaining to the warning sign was adduced at trial: (1) a DMR dated August 7, 1996, reported that Ancheta's crew had installed, for Hilo-bound drivers, a warning sign along the Pāhoa Bypass at the 11.18 mile marker, or approximately 50 feet south of the accident site; (2) Ancheta testified that, based on his recollection of the work order he reviewed shortly before trial, on August 7, 1996, his work crew was instructed to install the sign where, in fact, an "intersection ahead" sign was already in place; (3) Ancheta testified that road maintenance crews as a practice are granted discretion by their supervisors to adjust the location of signs in response to conditions at the scene; (4) Ancheta testified that, after Klink's accident, he personally observed the warning sign for Hilo-bound drivers at a location at least 500 feet further south of where the DOT engineers had originally directed his crew to place it back on August 7, 1996;[14] and (5) Ancheta testified that he and his crew relocated the Hilo-bound sign northward closer to the original location designated in the August 7, 1996 DMR, pursuant to a March 27, 1997 DMR. Nothing in the record controverts the foregoing evidence or raises doubts concerning the reasonable and rational inference drawn from it by the circuit court that, on August 7, 1996, a "Road Floods During Rain" sign was placed approximately 500 feet south of the site of Klink's accident and was at that location on the day of the accident. Therefore, the circuit court did not clearly err in so finding.[15]

14. Ancheta testified that he personally observed the sign 200 feet southward of the 0+00 marker on Exhibit 27. He further testified that the original work order instructed his crew to install the warning sign at 2+00 on exhibit 27, which is approximately 320 feet north from marker 0+00 and, hence, approximately 500 feet north from where he observed it actually located following the accident.

15. The Appellants also allege error by the circuit court in refusing a request to voir dire Ancheta on the basis of his assertion that he knew where

## B. The Circuit Court Did Not Abuse Its Discretion In Excluding Evidence Of Prior And Subsequent Accidents.

Evidence of other accidents may be "highly probative on material issues of a negligence action." *Simon v. Town of Kennebunkport*, 417 A.2d 982, 985 (Me.1980). "[E]vidence of other similar accidents or occurrences may be relevant circumstantially to show a defective or dangerous condition, notice thereof or causation on the occasion in question." *Id.* at 984–85. But "the introduction of other-accident evidence may carry with it the problems associated with inquiry into collateral matters...." *Id.* at 985. To minimize these problems we have cautioned our trial courts that:

[b]efore evidence of previous ... [accidents] may be admitted on the issue of whether or not the condition as it existed was in fact a dangerous one, it must first be shown [by the proponent of the evidence] that the conditions under which the alleged previous accidents

occurred were the same or substantially similar to the one in question.

*Warshaw v. Rockresorts, Inc.*, 57 Haw. [645,] 652, 562 P.2d [428,] 434 [ (1977) ]. But we recognize that "when the purpose of the offered evidence is to show notice," the required similarity in circumstances is considerably less than that demanded when the object is to show a defective or dangerous condition or causation, "since all that is required here is that the previous ... [accident] should be such as to attract the defendant's attention to the dangerous situa-

the sign was installed on August 7, 1996 and in overruling an objection to a question posed by the State regarding whether Ancheta had any doubt that, upon visiting the scene after Klink's accident, he had observed the warning sign "300–500 plus 200 to 250 feet south." Inasmuch as the basis for Ancheta's testimony concerning the purported original location of the sign and his lack of personal knowledge of the subject were fully developed later, any error by the circuit court in the challenged rulings was harmless.

tion which resulted in the litigated accident." *Id.*

Yet "even when sufficient similarity is shown, the admission of evidence of prior similar accidents is [still] within the discretion of a trial court." *Id.* (citations omitted). The evidence, of course, "may be excluded if the danger of unfair surprise, prejudice, confusion of the issues or the consideration of undue consumption of time is disproportionate to [its] value." *Id.* at 652, 562 P.2d at 434 (citations omitted); *see* [HRE Rule] 403.

*Kaeo v. Davis*, 68 Haw. 447, 455–56, 719 P.2d 387, 393 (1986) (some brackets added and some in original) (some internal citations omitted) (concluding trial court erred in excluding evidence of four prior accidents in vicinity of subject accident), *quoted in Tabieros*, 85 Hawai'i at 378, 944 P.2d at 1321. Therefore,

[t]he purpose for which the evidence is offered "is important in determining whether the proof will be admitted and how strictly the requirement of similarity of conditions will be applied." E. Cleary, [*McCormick on Evidence*] § 200, at 587 [(3d ed. 1984)].... [A]s we have seen, "[t]he strictness of [the] requirement of similarity of conditions is much relaxed ... when the purpose of the offered evidence is to show notice...." *Warshaw* ..., 57 Haw. at 652, 562 P.2d at 434[.]

*Kaeo*, 68 Haw. at 456–57, 719 P.2d at 393 (some internal quotation signals omitted).

### 1. *The Henderson–Bell accident*

■ The Appellants cite to Henderson–Bell's deposition, wherein he testified that, on December 4, 1998, while traveling northward on the Pāhoa Bypass, his vehicle encountered a "river or standing water" on the road that threw his vehicle into a counterclockwise spin, causing it to enter the southbound lane of travel and strike an oncoming vehicle. Henderson–Bell opined that "there was water on the road ... coming from a driveway.... [The water] seemed like it was coming from that driveway." The Appellants contend that there was such similarity to Klink's accident that the circuit court erred in excluding Henderson–Bell as a witness,

particularly because his testimony tended to prove the driveway was a source of the water.

While the similarities between Henderson–Bell's and Klink's accidents may be noteworthy, the record reflects that Henderson–Bell hydroplaned at a location on the highway at least three hundred yards farther north than Klink, *see supra* note 6. Insofar as the Appellants argue for the inclusion of the Henderson–Bell testimony as tending to prove that the driveway implicated in Klink's accident was a source of the water at Klink's accident site, the record does not reflect that the driveway implicated by Henderson–Bell was, in fact, the same driveway as in the present matter. If it was intended to prove the source of the water at the location Klink lost control of his vehicle, we cannot say that the circuit court abused its discretion in excluding Henderson–Bell's testimony. By the same token, inasmuch as the circuit court found that Klink's accident was caused by excess water on the roadway, *see supra* section I.D, FOF Nos. 50–56, any exclusion of Henderson–Bell's testimony that was intended to establish that excess water on the Pāhoa Bypass could cause hydroplaning likewise fell within the circuit court's discretion given the undue consumption of time it would have entailed proportionately to its value.

### 2. *The prior accidents*

■ The Appellants next argue that the circuit court erroneously excluded police reports of seven previous wet weather accidents that they maintain were relevant to establish notice, defect, and existence of a dangerous condition, citing *Kaeo*, 68 Haw. at 457, 719 P.2d at 393. They contend that prior accidents need not be identical to be probative, citing *Taylor–Rice v. State*, 91 Hawai'i 60, 76–77, 79, 979 P.2d 1086, 1102–03, 1105 (1999), and *Kaeo*, 68 Haw. at 455, 719 P.2d at 393. Although the latter proposition may be true, the fact remains that the Appellants failed at the hearing and again on appeal to articulate specifically how any of the seven accidents were sufficiently similar to Klink's accident—beyond the fact that each occurred during wet weather near the site of the accident—to justify a determination that

the circuit court abused its discretion in excluding them. As noted *supra*, the burden is on the proponent of the evidence to demonstrate sufficient similarity to meet the standard for the purpose for which the evidence is sought to be admitted.

> a. *Introduction of the seven reports as a basis for Krueper's analysis regarding whether the highway design met applicable safety criteria*

■ The Appellants' counsel argued for admission of the seven prior accident reports on the theory that Krueper would want to rely on them to form his opinion of the highway's design and construction and would want to refer to them as a basis for his opinion while testifying. The Appellants' counsel emphasized that Krueper would not be testifying specifically as to the details of the reports themselves.

■ The reports need not have been admitted for Krueper to rely on them because "expert opinion can be based upon matters otherwise inadmissible." *State v. Yip*, 92 Hawai'i 98, 108, 987 P.2d 996, 1006 (App. 1999). *See also Swink v. Cooper*, 77 Hawai'i 209, 215, 881 P.2d 1277, 1283 (App.1994) ("An expert's opinion may thus be based on even inadmissible evidence, including hearsay."); Addison M. Bowman, *Hawai'i Rules of Evidence Manual* § 703–2[1] (3d ed. 2006) ("So long as the expert's basis material meets [HRE R]ule 703's [16] criterion of 'reasonable reliance,' it need not be admissible in evidence. Indeed, the very purpose of the

reasonable reliance requirement is to set a standard for validating, as an expert's basis, material that will not achieve admissibility under [the HRE].)". Furthermore, in *Tabieros*, this court noted that "an expert may discuss the underlying facts and data upon which he or she is relying on direct examination, even though hearsay may be involved— at least for the limited purpose of disclosing the basis of his or her opinion" and held

> that HRE [Rules] 703 and 705 [17] do not foreclose an expert witness from revealing, in the course of direct examination, the contents of the materials upon which he or she has reasonably relied—hearsay though they may be—in order to explain the basis of his or her opinion, provided, of course, that (1) the expert has actually relied on the material as a basis of the opinion, (2) the materials are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," and (3) the materials do not otherwise "indicate a lack of trustworthiness."

85 Hawai'i at 384, 944 P.2d at 1327. Therefore, regardless of whether the reports were admitted into evidence, Kreuper could have relied on them to form his opinion of the design and construction of the highway and, if the three-pronged test articulated in *Tabieros* were satisfied, could have referred to the reports expressly during direct examination.[18]

Moreover, the reports set forth only the barest facts pertaining to the accidents and none are accompanied by further formal in-

16. HRE Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

17. HRE Rule 705 provides:

> The expert may testify in terms of opinion or inference and give the expert's reasons therefor without disclosing the underlying facts or

data if the underlying facts or data have been disclosed in discovery proceedings. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

18. Of course, in addition to ensuring that the requirements of the three-pronged test were met, the circuit court would also have been obligated to limit any testimony by Krueper pertaining to the contents of the reports through "appropriate restrictive supervision ... so as to allow only that necessary to explain to the [trier of fact] the manner in which the [otherwise inadmissible material] formed a part of the basis of [the] expert opinion." *Tabieros*, 85 Hawai'i at 383, 944 P.2d at 1326, *quoted in* Bowman, *supra*, § 703–2[2][D].

vestigations, including the September 9, 1994 and August 25, 1995 accidents, *see supra* section I.C. We conclude, therefore, that the circuit court did not abuse its discretion in considering the necessity of avoiding confusion of the issues and any undue consumption of time and ruling to exclude them.

b. *Introduction of the seven reports to establish that the State was on notice of a dangerous condition*

■ Insofar as the Appellants argue that the accident reports were improperly excluded because they were relevant to establish that the State was on notice of the dangerous condition "caused by water·at the cut slope area," the State concedes that it was on notice as to community concerns regarding both the flooding on the highway and the previous accidents in the area. It also concedes that "after the construction was completed, when there were complaints of water creating a potentially dangerous condition, the [S]tate then had a duty either to correct the condition or to warn of the condition." Therefore, bearing in mind that the Appellants failed to argue their "notice relevancy" theory at the pretrial hearing, any error in excluding the reports by virtue of their relevance to proof of notice would be harmless.

C. *The Circuit Court Was Wrong In Concluding That The State Fulfilled Its Duty To Design, Construct, And Maintain The Roadway In A Reasonably Safe Condition Or To Warn Adequately Of Any Unsafe Conditions.*

1. *The State had a duty to mitigate the known hazard or to warn motorists adequately of the danger.*

■ The duty of the State is to design and construct its highways in such a manner as to make them reasonably safe for their intended uses, and thereafter to maintain them in a reasonably safe condition.... The State's duty to maintain in-

cludes a duty to correct or inform the public of the existence of highway defects. *Taylor–Rice v. State*, 91 Hawai'i 60, 70, 979 P.2d 1086, 1096 (1999) (quoting *Lagua v. State*, 65 Haw. 211, 214, 649 P.2d 1135, 1137 (1982) (quoting *Breed v. Shaner*, 57 Haw. 656, 665, 562 P.2d 436, 441 (1977))) (emphasis omitted). "This court has, in a variety of contexts, repeatedly recognized a duty owed to all persons to refrain from taking actions that might *foreseeably* cause harm to others." *Id.* at 71, 979 P.2d at 1097 (emphasis in original) (citing, *inter alia, Knodle v. Waikiki Gateway Hotel, Inc.*, 69 Haw. 376, 385, 742 P.2d 377, 383 (1987) (for the proposition that, "under the prevailing rule[,] duty . . . is bounded by the foreseeable range of danger") (some brackets omitted); *Janssen v Am. Hawaii Cruises, Inc.*, 69 Haw. 31, 34, 731 P.2d 163, 165 (1987) (concluding that a "defendant owes a duty of care only to those who are foreseeably endangered by the conduct")).[19]

The State does not dispute that it owed Klink a duty to maintain the highway in a reasonably safe condition, which included the duty to mitigate and warn of known hazards; indeed, it concedes in the present matter that, "after the construction was completed, when there were complaints of water creating a potentially dangerous condition, the State then had a duty to correct the condition or to warn of the condition."

2. *The circuit court erred in concluding that the State did not breach a duty.*

The Appellants challenge COL Nos. 1 and 2, *see supra* section I.D, which respectively concluded that the State (1) fulfilled its duty to design and construct a reasonably safe highway and (2) fulfilled its duty to maintain the highway in a reasonably safe condition and to inform motorists of any highway defects. The Appellants also challenge FOF Nos. 34 and 57, *see id., supra*, claiming that the circuit court clearly erred when it found that the source of the water on the roadway

---

19. As this court concluded in *Taylor–Rice* (and the State does not challenge) the duty to avoid foreseeable harm to others applies equally to the State, particularly in light of HRS § 662–2 (1993), which provides in pertinent part: "The

State hereby waives its immunity for liability fo· the torts of its employees and shall be liable in the same manner and to the same extent as a private individual under like circumstances...."

remained "unknown" and "not proven," arguing that Haymore had admitted that the driveway was a source of the water and further claiming that it was clear error to find that the source of the water was critical to any remediation—a conclusion that implicitly discharged the State, pending further investigation, of its duty to undertake any mitigation efforts—arguing that the installation, in 1998, of the interceptor ditch established that the State recognized the feasibility of precautionary measures as a "cure" for the water flow.

### a. *The State breached its duty to mitigate the hazard in a timely manner.*

 Nishioka, charged with managing water runoff on the state highway system and with ensuring compliance with design standards, testified that the highway met all relevant design criteria. He testified that, based on the topographical survey of the site, an interceptor ditch was not required on the superelevated curve in question. Haymore concurred that, unless there were indications that water would flow across the highway, an interceptor ditch was not warranted in the design. Krueper, conversely, testified that, in his expert opinion, proper highway design did not solely adhere to generalized criteria but responded to conditions on-site and, because the site of the accident lacked any drainage for uphill water, the design of the Pāhoa Bypass did not demonstrate "professional engineering judgment" and was defective. Nevertheless, whether due to the design, construction, or the maintenance of the highway, the record is clear that, within weeks of the highway opening, Haymore observed water sheeting on the highway followed by community complaints of hazardous conditions. As the State concedes, it was at that point that the State was on notice that a hazard existed and was under a duty to address it.

### i. *The circuit court clearly erred in finding that the source of the water was unknown.*

 Although Haymore testified that "I . . . feel there's one source of water, and that would be the driveway," he also testified that he had never observed any water flowing from the driveway onto the roadway and, in fact, had only observed water flowing across the highway once, from the cutbank, and regarded it as an anomaly for which he could not offer an explanation. He further testified that none of the private citizens or police officers who complained of water sheeting on the roadway had ever ascertained the water's source. While Lt. Kelly encountered "significant" sheeting on the roadway during heavy rains, he offered no opinion as to its ultimate source. As head of the DOT's hydraulics design section, Nishioka testified, based on topographical maps surveyed before the construction of the highway, that water flow from the cutbank onto the highway would be "very minimal" and that he was unaware of any subsequent determination of the ultimate source of the water. Dracup, relying on photographs, testified that the shoulder sloped away from the roadway.[20]

Officer Ellazar, however, testified that, on several occasions, he had observed water flowing off the cutbank and onto and over the roadway into the southbound lane. He further testified that, on the day of the accident,

---

20. The Appellants allege that the circuit court abused its discretion in allowing Dracup to testify concerning the slope of the east shoulder, because his testimony was "speculative," based on "misleading photographs," and "contrary to credible, probative evidence." Inasmuch as (1) Dr. Dracup's status as an expert on the hydraulic aspects of highway drainage was established, (2) he had personally conducted a site visit, (3) the Appellants fail to substantiate beyond mere assertion that the photographs of the site were "misleading," particularly in light of Dr. Dracup's visit to the site, and (4) the fact that "[o]nce the basic requisite qualifications are established, the extent of an expert's knowledge of subject matter goes to the weight rather than the admissibility of the testimony," *Tabieros*, 85 Hawai'i at 351, 944 P.2d at 1294, the circuit court did not abuse its discretion in allowing Dr. Dracup to offer his opinion concerning the topography of the east shoulder of the highway. The same reasoning applies to the Appellants' allegation that the circuit court abused its discretion in allowing Dr. Dracup to opine that the detained water on the roadway visible in some photographs of the site was due to tire depressions in the highway rather than runoff.

he observed water "coming off of the north-bound into the southbound lane" and runoff debris along the lower west portion of the roadway, indicative of water flowing across the roadway. As noted, Lt. Kelly similarly reported that, even in moderate rain, water on the east side of the roadway would track the superelevated curve until, by the time it reached the location where Klink's accident occurred, it covered both lanes of travel. In addition, at least one private citizen present at the Safety Council meetings reported sheet flow at the location.

Krueper, during an inspection undertaken while it was drizzling, observed water coming off the driveway and "sheet flowing across the roadway." Moreover, in contrast to Nishioka's reliance on pre-construction topographical maps and Dracup's reliance on photographs of the site, Krueper conducted post-construction surveys of the site and determined that the cutbank along the highway sloped toward the road.

Inasmuch as (1) Nishioka's testimony was based on outdated topographical maps that he conceded could be rendered inaccurate by subsequent physical changes in the terrain wrought during the construction process, (2) Nishioka conceded (a) that he relied in his testimony on maps that did not contain measurements of the slope of the roadway or driveway and (b) that, based on Krueper's measurements of the site, heavy rainfall would flow from the driveway onto the highway, (3) Dracup did not conduct any measurements of the land along the highway to support his opinion and did not include the driveway area in his calculations of water flow across the roadway, (4) both Officer Ellazar and Krueper observed water flowing from the east bank of the roadway, from the driveway and the cutbank, even during light to moderate rainfall, and sheeting across both lanes of the roadway, (5) Haymore conceded that the driveway would be a likely source of the water and had personally observed water flowing off the cutbank, and (6) Krueper, employing post-construction measurements of the area, demonstrated that the cutbank and the driveway sloped toward the roadway, we conclude that the circuit court clearly erred in finding that the source of

the water had never been determined. In addition to Haymore's observance of the phenomenon, other uncontested testimony of independent witnesses, particularly Officer Ellazar and Lt. Kelly, established that rainfall, including light to moderate rainfall, produced a water flow from the east bank of the road that spread across both lanes of traffic. The circuit court's finding that the source of the water remained unknown, therefore, is not supported by substantial evidence in the record and, in any event, leaves this court "with a definite and firm conviction that a mistake has been made." *Troyer*, 102 Hawai'i at 410, 77 P.3d at 94. Rather, the uncontroverted testimony demonstrates that the origin of the water was rainfall and the source, or original location, of the flow onto the roadway was the east side of the roadway, including the cutbank and driveway.

ii. *Assuming arguendo that the source of the water remained "unproven," further determination of the source was clearly not critical to remediation.*

Both Haymore and McClure testified that remedial actions would be more effective the more was known concerning the source of the water. Haymore testified that "trying to figure out where the water came from was the big issue" but, during the more than five years during which he was aware of the water flow, he did not expend significant energy or time on further investigating the source. Following the citizen complaints, he "determined, or at least . . . felt, we should put in a ditch." Despite his inability to better ascertain the source of the water, following his second investigation of the area, Haymore wrote to McClure that it was "imperative" that a drainage facility be built. Although still unsure of the ultimate source of the water, Haymore concluded that "about the only cure" was to place a drainage facility "on the high side of the super[elevation]."

McClure, in turn, testified that, when devising a corrective plan, "the best measure is always to try to get the water at its source" but did not assert, as the circuit court found, that determining the source of the water was "critical" to any remediation efforts. In testimony, he could not recall what further

steps, if any, were taken to determine the source but testified that, nevertheless, his department proceeded with the interceptor ditch. Nishioka, charged with managing water runoff on the State's highway system, could not recall any studies undertaken to further determine the ultimate source of the water but, nevertheless, oversaw the design of the interceptor ditch.

Despite its apparent preference for determining more fully the ultimate source of the water, the State nevertheless constructed an interceptor ditch at the scene, even though neither McClure nor Nishioka could recall the details of any further investigations being conducted concerning the source. The only information deemed "critical" by state officials was *where* the water was crossing the road, not the ultimate source of the water, and, in light of the testimony of Lt. Kelly and Haymore, particularly concerning the complaints lodged with the Safety Council, the State was on notice as to *where* the water was crossing the road. The record does not contain substantial evidence that a determination of the *source* of the water was "critical" to any remediation and, therefore, FOF No. 57 is clearly erroneous, *see Troyer*, 102 Hawai'i at 409–10, 77 P.3d at 93–94. Rather, after reviewing the relevant testimony, this court is "left with the definite and firm conviction" that the circuit court made a mistake in finding that further determination of the source of the water was critical to any remediation. *Id.* at 410, 77 P.3d at 94.

iii. *The State failed to employ reasonable, available mitigation measures in a timely manner once apprised of the hazardous condition.*

■ In 1991, Haymore, driving the highway during a heavy rain, observed water flowing over the cutbank and covering both lanes of the highway. He assumed that the flow was caused by the adjacent landowners dumping water but did not make any inquiries to determine whether that was, in fact, the case. In early 1996, he and McClure received reports, from citizens and police officers, of water crossing the highway at the site in "significant" depths, during both moderate and heavy rains. Haymore deemed the

creation of a drainage facility at the site "imperative."

The State, for its part, contends that, (1) having conducted an investigation that failed to determine the source of the sheeting water that eye-witnesses had reported and then, (2) having erected a warning sign, it had fully discharged its legal duty to motorists. The State asserts that its engineers continued to consider corrective measures, but makes no representations that any further investigations were conducted into the ultimate source of the water.

■ This court has, at least obliquely, implied that the duty to maintain highways includes the duty to repair. *See Wemple ex rel. Dang v. Dahman*, 103 Hawai'i 385, 393, 83 P.3d 100, 108 (2004) (noting that " '[b]efore the municipality can be held responsible for maintenance, repair, and liability[,] there must be unequivocal acceptance by the municipality.' ") (quoting *Wemple I*, 102 Hawai'i 27, 51, 72 P.3d 499, 523 (App.2002) (quoting *Maui Ranch Estates Owners Ass'n. v. County of Maui*, 6 Haw.App. 414, 421, 724 P.2d 118, 123 (1986))). The case law of other jurisdictions is in general agreement that "[t]he duty of governmental bodies to 'maintain' streets or highways is ordinarily held to include the duty to repair." *Ehlinger v. Iowa*, 237 N.W.2d 784, 788 (Iowa 1976) (citing *Delarosa v. Arizona*, 21 Ariz.App. 263, 518 P.2d 582, 584 (1974); *Clay v. City of Los Angeles*, 21 Cal.App.3d 577, 98 Cal.Rptr. 582, 586 (1972); *Engman v. City of Des Moines*, 255 Iowa 1039, 125 N.W.2d 235, 237 (Iowa 1963); *Weiher v. Phillips*, 103 Ohio St. 249, 133 N.E. 67, 68 (1921); *McClung v. King County*, 119 Wash. 14, 204 P. 1064, 1065 (1922)). Nevertheless, once on notice of a hazardous condition, the State must be afforded a reasonable time to effect repairs. *Id.* (concluding that a state " 'must have actual notice of the dangerous condition of a street, or the condition must have existed for a sufficient time to enable the [State] to discover and repair the same, in the exercise of reasonable and ordinary care and diligence' ") (quoting *Abraham v. Sioux City*, 218 Iowa 1068, 250 N.W. 461, 462 (1933)). Inasmuch as (1) Haymore and, through him, the State, had long-standing knowledge of

the nature and location of the hazard, (2) sufficient information concerning the cause of the hazardous condition to effect repairs, as evidenced by the installation of the interceptor ditch, and (3) the State failed to articulate a reasonable justification for the delay in mitigating the hazard through installation of the ditch, we hold that the circuit court was wrong in concluding that the State did not breach "its duty to design, construct and/or maintain—which includes a duty to 'correct' defects in—the highway." *Taylor–Rice*, 91 Hawai'i at 74, 979 P.2d at 1100.

 b. *Assuming arguendo that the State fulfilled its duty to maintain, it breached its duty to warn adequately.*

 In addition to alleging that the State breached its duty to maintain the highway in a reasonably safe condition, the Appellants contend that the State failed to warn adequately of the danger, citing *First Ins. Co. of Hawaii, Inc. v. State*, 66 Haw. 413, 425, 665 P.2d 648, 656 (1983); *Tabieros*, 85 Hawai'i at 354, 944 P.2d at 1341; *Gump v. Walmart Stores, Inc.*, 93 Hawai'i 428, 436–37, 5 P.3d 418, 426–27 (App.1999). The State, for its part, concedes that, once it was on notice of the hazardous condition on the highway, it was under a duty either to repair the condition or to warn motorists adequately of the danger.

 The adequacy of a warning is generally a question for the trier of fact, although, in rare instances, the question of a warning's adequacy may be determined as a matter of law. *Acoba v. Gen. Tire, Inc.*, 92 Hawai'i 1, 15, 986 P.2d 288, 302 (1999) (pertaining to the adequacy of warnings in product liability disputes) (quoting *Wagatsuma v. Patch*, 10 Haw.App. 547, 574, 879 P.2d 572, 587 (1994) (" '[T]he issue of breach of duty is common to both negligence and strict products liability claims and is ordinarily one for the jury.' ")); *see also Bidar v. Amfac, Inc.*, 66 Haw. 547, 552, 669 P.2d 154, 159 (1983) (" '[W]hether the obligation to exercise reasonable care was breached is ordinarily a question for the trier of fact to determine.' "). The Appellants essentially contend, therefore, that the circuit court, sitting as the trier of fact, clear-

ly erred in its COL No. 2 in implicitly determining that the State discharged its duty to warn adequately.

 Our jurisprudence, however, offers no analytical tools for divining on review whether a highway warning was "adequate" and, therefore, whether the circuit court clearly erred in so concluding. When faced with a question of first impression, this court may turn to the case law of other jurisdictions for guidance. *State v. Cornelio*, 84 Hawai'i 476, 490, 935 P.2d 1021, 1035 (1997). The South Carolina Supreme Court has reasoned, concerning the adequacy of highway signage, that

> "[t]he [State] is not an insurer of the safety of travelers over the highways of the State, and *its duty is performed when it* keeps the highways in a reasonably safe condition for travel, and *erects and maintains sufficient signs … and warnings as may enable users of said highways, exercising ordinary care and prudence, to avoid injury to themselves and others.*"

*Taylor v. S.C. State Highway Dep't*, 242 S.C. 171, 130 S.E.2d 418, 422 (1963) (quoting *Epps v. S.C. State Highway Dep't*, 209 S.C. 125, 39 S.E.2d 198, 201 (1946)) (emphasis added). The North Carolina Supreme Court has noted that,

> [i]n the final analysis, the test of the sufficiency of the warning is not whether barriers or other physical devices are used, but is whether the means employed, whatever they may be, are reasonably sufficient to give warning of the danger. *Ordinarily, it would seem to be sufficient if a plain warning of danger is given and the traveler has notice and knowledge of facts sufficient to enable him, in the exercise of ordinary care, to avert injury.*

*Presley v. C.M. Allen & Co., Inc.*, 234 N.C. 181, 66 S.E.2d 789, 792 (1951) (citations omitted) (emphasis added).

 As stated *supra* in section III.A, the circuit court did not clearly err in finding that, on the day of the accident, a "Road Floods During Rain" sign was posted at least 500 feet prior to the scene of the accident, a sufficient distance before the hazard to fulfill professional guidelines for the proper place-

ment of the sign, even according to Krueper, the Appellants' expert witness.

Nevertheless, the circuit court found that Klink was traveling at thirty-five to forty miles an hour, fifteen to twenty miles an hour *below* the posted speed limit, and that, when his vehicle began its spin, he was traveling only twenty-five miles per hour. It found that there was excess water on the road in the vicinity, that runoff created sheet flow at the site of the accident, and that, as Klink approached the driveway on the eastern shoulder, he reasonably applied his brakes and thereafter lost control of his vehicle. It further found that "[t]he accident was caused by water on the roadway in sufficient magnitude to make it very slippery and cause loss of traction." The State's expert did not controvert Krueper's testimony that the conditions of Klink's tires did not contribute to the accident. In fact, the circuit court's FOFs are devoid of any finding of contributory negligence on Klink's part.

 Based upon the foregoing, the circuit court concluded that "[t]he activities of the State show that the State fulfilled its duty ... to install signs and, therefore, it did not breach its duty." The duty to warn adequately, however, is not fulfilled merely by installing signs if the measures taken are inadequate to "enable users of [the] highway, exercising ordinary care and prudence, to avoid injury to themselves and others." *Taylor*, 130 S.E.2d at 422. The circuit court, in concluding that the State had fulfilled its duty to warn, clearly erred as a matter of law when it implicitly found that the State's warnings were adequate. The record does not contain substantial evidence to support the conclusion that the State put Klink on sufficient notice of the gravity and severity of

the hazard present on the roadway "to enable him, in the exercise of ordinary care, to avert injury." *Presley*, 66 S.E.2d at 792. Accordingly, we are "left with the definite and firm conviction" that the circuit court made a mistake in concluding that the posted sign was adequate to apprise Klink of the hazard. *Troyer*, 102 Hawai'i at 410, 77 P.3d at 94.[21]

D. *The Circuit Court Erred In Concluding That The State's Negligence Was Not A Substantial Factor In Causing Klink's Death.*

 This court has long held, in the context of negligence actions, that

> [t]he best definition and the most workable test of proximate or legal cause so far suggested seems to be this: "The actor's negligent conduct is a legal cause of harm to another if (a) his [or her] conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his [or her] negligence has resulted in the harm." Restatement, Torts, § 431; Prosser on Torts, § 47.

*Mitchell v. Branch*, 45 Haw. 128, 132, 363 P.2d 969, 973 (1961); *see also Aga v. Hundahl*, 78 Hawai'i 230, 236, 891 P.2d 1022, 1028 (1995) (quoting the *Mitchell* test with approval). Under the *Mitchell* test, a

> *defendant's negligence need not have been the whole cause or the only factor in bringing about the harm. It was enough that his [or her] negligence was a substantial factor in causing the plaintiff's injuries.*

**21.** The Appellants raise two further allegations in their statement of points of error. They assert that FOF No. 43 was clearly erroneous in stating that Officer Ellazar did not observe runoff debris from the east side properties on the road and that he was unconcerned by the runoff he observed at the accident scene. A review of the relevant testimony reveals that the statements attributed to Officer Ellazar in FOF No. 43 should rightly be attributed to Officer Aurello, who testified that he saw no debris from the east properties in the northbound lane and that the water flow did not concern him. To that limited

degree, FOF No. 43 is clearly erroneous. The Appellants do not, however, articulate any argument as to how the mistaken attribution has any bearing on the outcome of the lawsuit. The Appellants also contend that FOF No. 44 is clearly erroneous, in that it is "incomplete" for failing to mention Lt. Kelly's testimony concerning his personal observations, prior to the accident, of water on the roadway. Inasmuch as FOF No. 44 correctly states Lt. Kelly's testimony as to his observations the day of the accident, it is not clearly erroneous.

*Knodle,* 69 Haw. at 390, 742 P.2d at 386 (citation, internal quotation marks, and brackets omitted). . . .

*Taylor–Rice,* 91 Hawai'i at 74, 979 P.2d at 1100 (emphases in original) (some brackets added and some in original). "The first arm of the test contemplates a *factual determination* that the negligence of the defendant was more likely than not a substantial factor in bringing about the result complained of." *Id.* at 74–75, 979 P.2d at 1100–01 (some emphasis added and some omitted) (citations omitted). Appellate review of a lower court's determination of legal causation is, therefore, subject to a clear error standard. *Id.* (citing *Mitchell,* 45 Haw. at 139, 363 P.2d at 977).

1. *The circuit court clearly erred in determining that the State's breach of duty was not a substantial factor in causing Klink's death.*

■ The circuit court found that runoff created sheet flow at the site where Klink lost control of his vehicle and that the accident was caused by excessive water on the highway. Officer Ellazar and Lt. Kelly testified that, during regular and heavy rains, water would sheet across both lanes of travel in "significant" depths, sufficient on one occasion to cause Officer Ellazar nearly to lose control of his vehicle. The circuit court further found that "[w]here there is banking or superelevation of a highway, custom and practice requires placement of an interceptor ditch at the edge of the shoulder to capture water running off adjacent slopes and driveways." Moreover, the State was on sufficient notice of the source of the water to be subject to a duty to act to remedy the hazard, *see supra* sections III.C.2.a.i–iii. The State installed the interceptor ditch in 1998 and Dracup, the State's expert hydrologist, testified that it intercepted water from the east driveway and diverted it from the highway for at least two hours after a light rain. Finally, as noted *supra* in section III.C.2.b, the record is devoid of any evidence of contributory negligence on Klink's part.

Based on the foregoing, we hold that the circuit court clearly erred when it found that the State's failure to install the interceptor ditch, to take other remedial action, or to warn adequately of the severity of the hazard faced by motorists on the bypass during moderate to heavy rains was not a substantial factor in bringing about Klink's death, *Taylor–Rice,* 91 Hawai'i at 74, 979 P.2d at 1100.

2. *There are no policy concerns or rules of law that militate against imposition of liability on the State.*

"The second arm of the *Mitchell* test contemplates inquiry whether there are policy concerns or rules of law that would prevent imposition of liability on the negligent party although his negligence was clearly a cause of the resultant injury." *Taylor–Rice,* 91 Hawai'i at 75, 979 P.2d at 1101 (emphasis omitted).

■ The State does not allege that any contributory negligence on Klink's part or any other superceding intervening event interceded in the chain of causation so as to relieve the State of liability. Rather, on the facts of this case, it was clearly foreseeable that motorists would travel the section of highway at issue during moderate to heavy rains, at speeds of forty miles an hour or greater—given the fifty-five mile an hour speed limit—and encounter the water hazard that Klink did on the morning of March 9, 1997. *See id.* at 76, 979 P.2d at 1102 (citing *McKenna v. Volkswagenwerk Aktiengesellschaft,* 57 Haw. 460, 466, 558 P.2d 1018, 1023 (1977), for the proposition that only unforeseeable intervening negligent acts break the chain of causation sufficient to relieve an actor of liability). Although "[t]he State is not the insurer of the personal safety of every member of the motoring public," its "duty . . . is to design and construct its highways in such a manner as to make them reasonably safe for their intended uses, and thereafter to maintain them in a reasonably safe condition." *Pickering v. State,* 57 Haw. 405, 409, 557 P.2d 125, 128 (1976) (citing *Ikene v. Maruo,* 54 Haw. 548, 511 P.2d 1087 (1973); *Boyce Motor Lines v. N.Y.,* 280 A.D. 693, 117 N.Y.S.2d 289 (1952); *Overton v. Wenatchee Beebe Orchard Co.,* 28 Wash.2d 377, 183 P.2d 473 (1947)).

■ In the present matter, the State is not liable to the Appellants merely because

an accident occurred on the Pāhoa Bypass in the early morning of March 9, 1997. Where the State is not on notice of a hazard and otherwise fulfills its duties to design, construct, and maintain its highways, to conduct a reasonably thorough investigation and undertake repairs in a timely and reasonable manner, and to warn motorists of existing hazards sufficiently "to enable users of said highways, exercising ordinary care and prudence, to avoid injury to themselves and others," *Taylor*, 130 S.E.2d at 422, the State quite rightly will not be liable for accidents that may occur.

Liability in the present matter exists because the State was on notice as early as 1991, and certainly by early 1996, of the hazardous water accumulations on the subject section of the Pāhoa Bypass but failed to undertake timely and reasonable measures to mitigate the danger or to warn adequately of the severity of the hazard. Further investigation was not critical to the remediation of the hazard; indeed, the record reflects that the State installed the interceptor ditch based on Haymore's 1991 observations and on the reports received of water emanating from the property along the eastern side of the highway, without the need for any further determination as to its source.

The record is devoid of substantial evidence to support the circuit court's conclusion that there was insufficient proof that the State's negligence in addressing the hazard was not a substantial factor in causing Klink's death, and we are unaware of any policy concerns or rules of law that would prevent imposition of liability on the State. *Taylor–Rice*, 91 Hawai'i at 74, 979 P.2d at 1100. The circuit court's COL No. 3 was therefore wrong. *Id.* at 74–75, 979 P.2d at 1100–01. We hold as a matter of law that the State breached its duty to maintain and warn and further that the State's breach was the legal cause of Klink's death.

## IV. *CONCLUSION*

In light of the foregoing, we vacate the circuit court's October 7, 2002 amended judg-

ment and remand this matter for a trial on the issue of the Appellants' damages.

