**NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-24-0000619
28-FEB-2025
08:49 AM
Dkt. 49 MO**

NOS. CAAP-24-0000619 AND CAAP-24-0000620

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

**CAAP-24-0000619**
IN THE INTEREST OF T.J. I.T., A.T.1, A.T.2, and K.T.2

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(CASE NO. FC-S 23-00105)

and

**CAAP-24-0000620**
IN THE INTEREST OF L.T.

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(CASE NO. FC-S 24-00081)

**MEMORANDUM OPINION**
(By: Hiraoka, Presiding Judge, Wadsworth and McCullen, JJ.)

K.T. (**Father**) is the legal father and J.J. (**Mother**) is the natural mother of I.T., A.T.1, A.T.2, K.T.2, and L.T. (collectively, **Children**).  Mother is the natural mother and **K.D.** is the natural and legal father of T.J.[1]  Father appeals from the September 9, 2024 "Orders Concerning Child Protective Act" entered in FC-S No. 23-00105 and FC-S No. 24-00081 by the Family Court of the First Circuit.[2]  The orders awarded the state Department of Human Services (**DHS**) foster custody over I.T.,

---

[1]  T.J. was involved in one of the underlying cases but is not a subject of these appeals.

[2]  The Honorable Lesley N. Maloian presided.

A.T.1, A.T.2, K.T.2, and L.T. and approved a December 5, 2023 Family Service Plan.  The family court erred by overruling Father's objection when DHS asked a doctor for her opinion on T.J.'s and I.T.'s credibility, but we conclude the error was harmless.  Accordingly, we affirm the family court orders.

On December 7, 2023, DHS petitioned to place T.J., I.T., A.T.1, A.T.2, and K.T.2 in foster custody, creating FC-S No. 23-00105.  The family court held a hearing on September 9, 2024.  The Order[] Concerning Child Protective Act was entered on September 9, 2024.  Father appealed, creating CAAP-24-0000619.  The family court entered findings of fact (**FOF**) and conclusions of law (**COL**) on October 10, 2024, consistent with Hawaiʻi Family Court Rules (**HFCR**) Rule 52(a).

On June 18, 2024, DHS petitioned to place L.T. in foster custody, creating FC-S No. 24-00081.  The family court held a hearing on September 9, 2024.  The Order[] Concerning Child Protective Act was entered on September 9, 2024.  Father appealed, creating CAAP-24-0000620.  The family court entered FOFs and COLs on October 10, 2024, consistent with HFCR Rule 52.

We consolidated the appeals.  Father challenges several FOFs and one COL entered in both cases.  We review findings of fact under the *clearly erroneous* standard, and conclusions of law under the *right/wrong* standard.  Est. of Klink ex rel. Klink v. State, 113 Hawaiʻi 332, 351, 152 P.3d 504, 523 (2007).  We review a mixed finding of fact and conclusion of law under the *clearly erroneous* standard because it implicates the facts and circumstances of the case.  Id.  A ruling supported by the trial court's findings and correctly applying the law will not be overturned.  Id.

Unchallenged FOFs are binding on appeal.  In re Doe, 99 Hawaiʻi 522, 538, 57 P.3d 447, 463 (2002).  Father has not challenged these FOFs:[3]

---

[3]     Numbering is from FC-S No. 23-00105; identical FOFs were entered in FC-S No. 24-00081.

18.    On [October 19, 2023], the DHS met with [Father] in the [Kapiʻolani Medical Center for Women and Children] Cafeteria.  [Father] confirmed he was a registered sex offender, and that his case was due to him having sex with a fourteen (14) year old, when he was twenty (20) years of age.  Father reported the minor told him she was sixteen (16) years of age.  Father reported, the judge told him that if he had been a year younger, he would not have been convicted for sexual assault.  Father reported he completed the recommended treatment for his probation.

.  .  .  .

43.    On [November 8, 2023], the DHS spoke to [resource care giver (**RCG**)] who reported she asked the older girls to bathe themselves and she waited outside of the bathroom for the girls to finish.  [T.J.] became hysterical and was screaming and crying that nobody believed her.  [RCG] asked [T.J.] what happened and she reported [Father] touched her vagina (aka "flower") while Mother was working[.] . . . She also disclosed that he made her touch herself and then he stuck his finger into her "flower" [vagina] and it hurt.

44.    The DHS referred [T.J.], [I.T.,] and Mother for sex abuse treatment with Child and Family Services ("CFS") Ohana Sex Abuse Treatment Program.

45.    The DHS spoke with VCM [(Voluntary Case Management)] case manager, Ms. Tomi Tangonan, who confirmed that [T.J.] disclosed sex abuse by [Father] to her and that she was not [T.J.]'s therapist as reported by [K.D.]

.  .  .  .

48.    On November 9, 2023, the DHS met with all five (5) children [(T.J., I.T, A.T.1, A.T.2, and K.T.2)] with HPD Detective Monma.  The DHS met with [T.J.] alone with Detective Monma.  [T.J.] disclosed that when the family was living in their old home . . . , [Father] touched her flower and then stuck his finger inside of her.  When asked where Mother was, she reported that Mother was at work.  [T.J.] reported that she did not want to return to the care of Mother and [Father].  The DHS also met with [I.T.] alone and she disclosed that [Father] also touched her and pointed to her vaginal area.

49.    On November 9, 2023, the DHS logged [T.J.]'s disclosure as another report of alleged sex abuse by [Father] to minor [T.J.]

50.    The DHS met with [RCG] and she reported that [I.T.] disclosed to her that [Father] told [I.T.] that if she told anyone, he would take her mother away and blame her because she was touching herself.

.  .  .  .

53.    . . . The DHS referred [Father] to sex offender treatment with CFS Ohana Sex Abuse Treatment Program.

54.    On November 20, 2023, [T.J.] and [I.T.] were forensically interviewed for the second time.  [T.J.]

3

disclosed sex abuse by [Father] during her interview, while [I.T.] did not.  Later in the day, the DHS spoke with [RCG]. During this telephone conversation, [I.T.] came onto the phone, crying and reported that she was afraid of the CJC [(Children's Justice Center)] interviewer, and didn't tell that "her daddy had touched her flower" because her daddy told her that if she told anyone he would take away her mother and blame it on her.

. . . .

56.    On November 21, 2023, the DHS spoke to Dr. Giovannoni, [Father]'s previous sex offender treatment provider.  Dr. Giovannoni reported he reluctantly clinically discharged [Father], and still had concerns.  [Father] did not appear to have fully engaged in treatment and was just going through the motions to satisfy his probation.  He met with Mother and completed a safety plan with Mother regarding [Father] crossing sexual boundaries. Dr. Giovannoni recommended that the Prosecutor's Office be informed of [T.J.]'s disclosures and [Father] complete another sex offender assessment.

. . . .

66.    On February 6, 2024, the GAL [guardian ad litem] filed his Guardian Ad Litem's Settlement/Pretrial Statement. The GAL argued . . . [I.T., A.T.1, A.T.2 and K.T.2]'s psychological and physical health or welfare has been harmed or is subject to threatened harm by the acts of omissions of the children's family, specifically [Mother] and [Father]. The GAL also argued that [T.J.]'s psychological and physical health or welfare has been harmed or is subject to threatened harm by the acts of [sic] omissions of the child's family, specifically [Mother] and [Father].

. . . .

72.    The MDT [(Child and Family Multidisciplinary Team)] Conference found the children have been exposed to domestic violence, prenatal substance abuse, and have not been provided adequate shelter, education, physical care, or medical care.  [T.J.] and [I.T.] have disclosed sexual abuse perpetrated on them by [Father].  [T.J.] had a clear disclosure regarding the sexual abuse at the CJC and the sisters have disclosed to their previous RCG that [Father] has sexually abused them, and they witnessed domestic violence between [Father] and Mother.[sic]

. . . .

74.    The MDT Conference Report recommended regarding placement:  The children remain in their current resource care placement homes with the possibility of relicensing the home of maternal uncle and aunt.  No children (including the unborn child that is expected by Mother in June 2024) should be placed or live with [Father] and Mother.  [Father] should not have any contact with children at this time.

. . . .

78.    On March 25, 2024 and March 27, 2024, [Father] underwent a Psychosexual Risk Assessment.  The <u>MSI II Overview</u> of the Psychosexual indicates the following:

> That [Father's] test taking behavior indicates he was defensive on testing and the information is limited. "He [sic] is defensive about expressing interest in sex, which suggests he is trying to "look good" sexually on the examination.  He may be attempting to convince the evaluator that sine [sic] he has little interest in sex, he has to [sic] sexual problems.  He was inconsistent in his response to the repeated item which refers to having committed a sex offense.  He acknowledges some type of sexual behavior occurred, i.e., he did not plan it, it was an accident, the person acted older, he made a mistake, etc. [sic]
>
> . . . .

128.   On November 9, 2023, [T.J.] disclosed to her RCG that [Father] touched her "flower" (as she called her vagina) stuck his finger in and out of her and it hurt.

129.   On November 9, 2023, the DHS met with the Children at the home of the RCG home with Honolulu Police Department ("HPD") Detective Monma.  The DHS met with [T.J.] alone and she disclosed that when the family was living in their old home . . . , [Father] had touched her "flower" and then he stuck his finger inside of her.  The DHS also met with [I.T.] alone and she disclosed that [Father] had also touched her and pointed to her vagina area.  [I.T.] also disclosed to the resource care giver that [Father] told her that if she told anyone, he would take away her mother from her and blame her that she was touching herself.

. . . .

131.   On November 20, 2023, [T.J.] and [I.T.] participated in a forensic interview at the CJC.  [T.J.] disclosed sex abuse by [Father] during the interview, while [I.T.] did not.  Later after the interview, while the DHS was talking to the resource care giver on the phone, [I.T.] came on the phone crying and said that she was afraid of the interviewer, that "her [sic] daddy had touched her "flower", and that he told her if she told anyone he would take away her mother and blame it on her.

132.   On November 21, 2023, the DHS spoke with Dr. Joseph Giovannoni ("Dr. Giovannoni"), [Father]'s previous sex offender provider.  Dr. Giovannoni reluctantly, clinically discharged [Father] but had continued concerns because [Father] did not appear to have fully engaged in treatment and was just going through the motions to satisfy his probation.  Dr. Giovannoni had met with Mother and completed a safety plan with her regarding [Father] and the crossing of sexual boundaries.  Dr. Giovannoni recommended that the Prosecutor's Office be informed of [T.J.]'s disclosure and that [Father] complete another sex offender assessment.

133.   On November 24, 2023, the DHS confirmed the following harms or threatened harms to the Children: (1) sexual abuse to [T.J.] and [I.T.] by [Father];

(2) threat of sexual abuse to the Children by [Father] and Mother; [and] (3) threat of neglect to the Children by [Father] and Mother[.] . . .

134.  On February 22, 2024, a Multidisciplinary Team ("MDT") meeting was convened at the DHS' request that included various professionals, including a pediatrician, a psychologist, a nurse, and an independent social worker not employed by the DHS.  The purpose of the MDT was to (1) assist in the development of an appropriate service plan for the family; and (2) assist in case review/direction and the current status of the case.

135.  The February 22, 2024, MDT found that due to the CJC interview with [T.J.], [Father]'s past conviction of sexually abusing a minor, Parents' lack of engagement in services, and Mother's refusal to hold [Father] responsible for sexually abusing [T.J.] and [I.T.], neither parent had demonstrated the ability to provide a safe and protective home for the Children.

136.  The February 22, 2024, MDT recommended that no children should reside with [Father] and Mother until they can demonstrate safe and protective caregiving abilities.

137.  On April 12, 2024, another MDT meeting was convened to address [Father]'s psychosexual assessment as well as to continue to (1) assist in the development of an appropriate service plan for the family; and (2) assist in case review/direction and the current status of the case.

138.  The April 12, 2024, MDT found no substantial change in the protective stance of Mother and [Father] regarding the sexual abuse disclosed by [T.J.] and [I.T.]. Both parents continue to deny that any sexual abuse occurred and therefore, the risk of further sexual abuse has not been addressed.  [Father]'s most recent psychosexual evaluation indicates positive impression management and defensiveness, elevated risk for child molestation, poor impulse control, difficulty with authority, and conflict in interpersonal relationships.  The continued diagnosis of antisocial personality disorder indicates a high treatment resistant criminal mindset established over time.  These results are consistent with Dr. Giovannoni's statement that emphasizes a reluctance to provide clinical discharge as the prior treatment episode did not seem to effect substantial changes in the attitudes and beliefs that drive behavior, and that the likelihood to re-offend was still significant.

(Footnotes omitted).

Father challenges FOF no. 58 (in both cases):

58.  On November 24, 2023, sex abuse to [T.J.] by her mother's boyfriend, [Father], was confirmed; Sex abuse of [I.T.] by her father [Father] was confirmed; Threat of sex abuse to [I.T., A.T.1, A.T.2, and K.T.2] by their parents, [Father] and [Mother] was confirmed; Threatened neglect of [T.J., I.T., A.T.1, A.T.2, and K.T.2] by their mother, [Mother], and mother's boyfriend/children's father [Father] was confirmed[.]

Father argues this finding doesn't state the name of the person who made these confirmations.  Father's argument is not persuasive because the findings are directly supported by DHS's December 5, 2023 **Safe Family Home Report** prepared by social worker Kaleimomi **Cezar**, admitted as Exhibit 2.  Cezar testified and was subject to cross-examination.  Hawaii Revised Statute (**HRS**) § 587A-18(d)(2018).  The family court qualified her as an expert in social work and child protective and child welfare services, and found she was credible.  FOF no. 58 was not clearly erroneous.

Father challenges FOF no. 73 (in both cases) in part:

> 73.  . . . There were clear disclosures of sexual abuse by [Father] on November 20, 2023, during the CJC interviews.

Father argues I.T. disclosed no sexual abuse during her November 20, 2023 CJC interview.  She didn't.  But DHS's Safe Family Home Report states that after the interview ended, I.T. spontaneously said "her daddy had touched her flower" and he told her "if she told anyone he would take away her mother and blame it on her."  Father is correct that I.T.'s disclosure happened after the formal interview ended, but the family court's error was harmless because the record has evidence that I.T. disclosed sex abuse by Father on November 20, 2023.

Father challenges FOF no. 88 (in both cases) in part:

> 88.  . . . The Court denied [Father]'s request for . . . a copy of his psychosexual evaluation.

Father doesn't dispute the finding, but argues the family court abused its discretion by denying him a copy of his psychosexual evaluation because he "has the right to have another psychosexual evaluator review his evaluation."  A court abuses its discretion if it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.  Est. of Klink, 113 Hawaiʻi at 352, 152 P.3d at 524.  The family court ordered that all

7

evaluations be given to Father's counsel. Father could have reviewed the evaluation with counsel and asked for a review by another evaluator. He doesn't explain how not having his own copy of the evaluation deprived him of a chance to have another evaluator review it. The family court acted within its discretion by denying Father's request for another copy.

Father challenges FOF no. 95 in FC-S No. 23-00105, which is FOF no. 107 in FC-S No. 24-00081, in part:

> 95. At the conclusion of the GAL's testimony, the parties gave brief closing arguments and the Court found by a preponderance of the evidence that based upon the reports submitted pursuant to HRS §§ 587A-7 and 587A-18 and the record herein, that there is an adequate basis to sustain the Petition in that the Children are children whose physical or psychological health or welfare has been harmed or is subject to threatened harm by the acts or omissions of the Children's family; (2.)[sic] The DHS is awarded foster custody over the children[.]

Father argues there was insufficient evidence he sexually abused T.J. and I.T.: no evidence about the dates the alleged sex abuse occurred; I.T. at first denied sex abuse; and T.J. did not disclose sex abuse during her initial interviews. FOF nos. 95/107 are supported by unchallenged FOF nos. 43, 45, 48, 49, 50, and 54, and by the testimony of DHS social workers Cezar and Renee **San Nicolas**, William **Gillespie**, whom the family court qualified as an expert in sex offender polygraph examination, and Francisco **Najera**, Ph.D., all of whom the court found to be credible. FOF nos. 95/107 were not clearly erroneous.

Father challenges FOF no. 105 in FC-S No. 23-00105: "[T.J.]'s and [I.T.]'s disclosures of sex abuse by [Father] were consistent and credible." Father argues T.J. did not disclose sex abuse in her first interview with the police, I.T. did not disclose sex abuse in her CJC interviews, and when I.T. was interviewed by CJC she said Parents never harmed her or T.J. FOF no. 105 is supported by the family court's unchallenged findings that T.J. and I.T. had disclosed sex abuse by Father multiple times to multiple people. Father denied sexually abusing T.J.

and I.T. but the family court found him "not a credible witness[.]"  "It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact."  In re Doe, 95 Hawaiʻi 183, 190, 20 P.3d 616, 623 (2001).  FOF no. 105 was not clearly erroneous.

Father challenges FOF no. 116 in FC-S No. 23-00105, which is FOF no. 126 in FC-S No. 24-00081:

> 116.  [Father]'s current involvement with child protective/welfare services and the family court is due to his sex abuse of [T.J.] and [I.T.] and domestic violence with Mother, which directly caused the Children to be subject to the abuse and threat of abuse and neglect.

Father argues DHS only became involved because K.T.2 suffered a seizure, and there is no evidence that domestic violence occurred in Children's presence.  The family court found, and Father doesn't dispute, that Children's **Aunty** took K.T.2 to an emergency room with a high fever and seizures on October 18, 2023.  DHS met with Mother and Father on October 19, 2023.  On October 20, 2023, Aunty told DHS that Father and Mother "have a history of domestic violence."  DHS also met with K.D. (T.J.'s father) who stated he wasn't letting T.J. have contact with Father because of an ongoing investigation by HPD Detective **Izuka**.  Detective Izuka gave DHS a copy of T.J.'s forensic interview on October 24, 2023.  DHS's further investigation revealed evidence that Father had sexually abused T.J. and I.T.  The family court became involved on December 7, 2023, when DHS filed the Petition for Temporary Foster Custody in FC-S No. 23-00105.  FOF nos. 116/126 were not clearly erroneous.

Father challenges FOF no. 119 in FC-S No. 23-00105:

> 119.  [Father] sexually abused [T.J.] and [I.T.]

The family court made a similar finding in FC-S No. 24-00081, FOF no. 129, that "[Father] sexually abused [L.T.]'s siblings [T.J.] and [I.T.]"  Father argues there was substantial evidence that K.D. coached T.J. to lie about Father sexually

abusing her.  FOF nos. 119 and 129 are supported by the family court's unchallenged findings and substantial evidence in the record.  They were not clearly erroneous.

Father challenges FOF nos. 140, 143, and 144 in FC-S No. 23-00105, which are FOF nos. 150, 153, and 154 in FC-S No. 24-00081:

> 140.  On May 22, 2024, [Father] participated in a polygraph examination with William Gillespie ("Mr. Gillespie").  The polygraph examination results showed no deception was indicated to the relevant questions.  The polygraph exam was valid in regards to manner and method of how it was conducted and as to the results.  It was conducted on a properly functioning instrument, [Father] was properly interviewed, and [Father] produced usable data to make a proper conclusion.
>
> The limitation to polygraph exams in cases like [Father]'s is what information is provided as well as what can be tested in the exam.  Mr. Gillespie was provided very little information.  Based on the information provided, Mr. Gillespie conducted a polygraph examination related to [Father] engaging in behaviors for sexual gratification purposes.  [Father] was found to be truthful on that point.  In this situation the client controls the examination and not the examiner and the results are a weak examination with a lot of room for interpretation.
>
> . . . .
>
> 143.  The limited results of the polygraph examination do not negate [Father]'s sex abuse of [T.J.] and [I.T] and the risk of future sexual abuse of the Children.
>
> 144.  The limited results of the polygraph examination do not negate the current need for [Father] to participate in sex abuse treatment until clinically discharged.

Father argues: the finding "the results are a [weak] examination with a lot of room for interpretation" is contrary to the findings that the "polygraph exam was valid in regards to manner and method of how it was conducted and as to the results"; the "polygraph speaks for itself and clearly found no deception when asked whether he sexually abused T.J. or I.T."; and Dr. Francisco **Najera** "testified that Father cannot receive a clinical discharge without admitting the sexual abuse."

Father's argument is not persuasive.  The polygraph examiner did not ask Father whether he sexually abused T.J. or I.T.  The questions and answers were:

> 1)      Have you ever physically touched [T.J.] for a
>         sexual reason?
>
>         NO
>
> 2)      Have you ever physically touched [I.T.] for a
>         sexual purpose?
>
>         NO
>
> 3)      Have you ever exposed your bare genitals to any
>         of your children you children [sic] for sexual
>         purpose?
>
>         NO

Gillespie testified that "sexual abuse is actually not rooted in . . . sexual pleasure, but in power and control." Thus, limiting the questions to sexual reasons or purposes weakened the examination.  The family court explained in this unchallenged finding:

> 141.  Sexual misconduct is broader in scope than just for sexual gratification purposes.  It includes sexual harassment, creating sexually hostile environments, and being sexually demeaning.  Its foundation is in power and control.  Touching for [Father]'s own sexual gratification would not be in the same test as touching as a form of power or control.

Father's argument about Dr. Najera's testimony seems to be that because he was truthful about not touching T.J. or I.T. for sexual reasons or purposes, he could never be clinically discharged because he couldn't admit to something he didn't do. But the family court explained in this unchallenged finding:

> 142.  Polygraph examinations are used therapeutically as part of a client's ongoing supervision and treatment.  It helps to identify and clarify behaviors which allow for better decision making as it relates to needed services and overall decision making.

FOF nos. 140/150, 143/153, and 144/154 were not clearly erroneous.

Father challenges FOF no. 145 in FC-S No. 23-00105, which is FOF no. 155 in FC-S No. 24-00081:

> 145.  The Children's physical or psychological health or welfare have been harmed and is subject to threatened harm by the acts or omissions of the Children's family.

Father argues, "[t]his is a broad finding that covers every possibility.  There is no expert testimony by a mental health professional that there is harm or threatened harm to the children's psychological health or welfare."  The finding was supported by the family court's unchallenged findings and substantial evidence in the record.  The family court had to make this finding to have jurisdiction over DHS's petitions.  HRS § 587A-28(d)(1) (2018) (requiring a family court to determine "[w]hether the [subject] child's physical or psychological health or welfare has been harmed or is subject to threatened harm by the acts or omissions of the child's family").  Father cites no authority to support his argument that expert testimony was required.  FOF nos. 145/155 were not clearly erroneous.

Father challenges FOF no. 149 in FC-S No. 23-00105, which is FOF no. 159 in FC-S No. 24-00081:

> 149.  [Father] is currently not willing and able to provide the Children with a safe family home, even with the assistance of a service plan.

Father argues he and Mother had acquired housing by the time of the September 9, 2024 return hearing.  Living in a house is only one of the factors the family court must consider to make a "safe family home" determination.  HRS § 587A-7 (2018).  FOF nos. 149/159 are supported by the family court's unchallenged findings and substantial evidence in the record.  They were not clearly erroneous.

Father challenges FOF no. 152 and COL no. 20 in FC-S No. 23-00105, which are FOF no. 162 and COL no. 20 in FC-S No. 24-00081:

> 152.  The Service Plan . . . , is fair, appropriate, and comprehensive in addressing the identified safety issues.
>
>        . . . .

> 20. The Service Plan . . . , is fair, appropriate, and comprehensive in addressing the identified safety issues.

Father argues the service plan requires him to take part in sex offender treatment with Dr. Najera, who testified that Father cannot receive a clinical discharge without admitting to sexual abuse. The family court's mixed findings and conclusions are supported by the family court's unchallenged findings and substantial evidence in the record, and reflect a correct application of the law. They were not clearly erroneous.

Father challenges FOF no. 153 in FC-S No. 23-00105, which is FOF no. 163 in FC-S No. 24-00081, in part:

> 153. None of the underlying facts and data upon which the DHS based its opinions, assessments, and recommendations were shown to be untrustworthy.

Father argues the "record does not contain evidence of how the DHS reconciled nondisclosure by T.J. and I.T. during formal interviews by HPD and the CJC." Father cites no authority requiring DHS to justify a child witness's initial reluctance to reveal abuse. FOF nos. 153/163 are supported by the family court's unchallenged findings and substantial evidence in the record. They were not clearly erroneous.

Father challenges FOF no. 157 in FC-S No. 23-00105, which is FOF no. 167 in FC-S No. 24-00081:

> 157. [Father] was not a credible witness, and the Court rejects his testimony in part.

Father argues the "finding does not identify what testimony is rejected in part to find him not credible." The family court, as the trier of fact, is the sole evaluator of a witness's credibility. In re Doe, 95 Hawaiʻi at 190, 20 P.3d at 623. The family court did not have to specify why it found Father not credible, or which testimony it rejected. FOF nos. 157/167 were not clearly erroneous.

Without identifying a FOF, Father argues the family court:

erred in finding medical neglect by [Father] when K.T.[2] was not taken to his follow-up doctor appointment after his seizure.  Mother and [Father] being homeless they allowed relatives to care for K.T.[2].  K.T.[2] was in the care of these relatives when he had his seizure.  [Father] expected these relatives to take K.T.[2] to his follow-up appointment.  They did not.  There is no evidence in the record that [Father] intentionally did not take K.T.[2] to the follow-up appointment.

The family court addressed medical neglect in FOF no. 73:

> 73.    The MDT also reviewed its previous report dated November 16, 2023, and found that it had previously assessed that [K.T.2]'s seizure was not due to abuse.  The minor had a febrile seizure due to an ear infection, which his father failed to bring him in for a follow-up care.  Although parents gave permission for an aunt and uncle to care for [K.T.2], they did not allow aunt and uncle to take him for follow-up care; this is consistent with medical neglect.

The issue was also discussed in this unchallenged FOF:

> 25.    [Aunty] reported that it was difficult for her to access medical care for the children because [Father] and Mother insisted that they would tell [Aunty] when the children's doctors' appointments were scheduled.  [Father] and Mother also insisted that she transport everyone to the children's appointments.  Neither [Father] nor Mother told [Aunty] when [K.T.2]'s follow-up appointments were after his first visit to the ED, when his ear infection was initially diagnosed.

The family court's finding about medical neglect was supported by the family court's unchallenged finding and substantial evidence in the record.  It was not clearly erroneous.

Without citing to the record, Father argues the family court "erred by allowing Dr. Natarajan to testify as to the credibility of T.J. and I.T. over [Father]'s objection."  The family court qualified Kayal **Natarajan**, M.D., FAAP, as an expert in pediatric medicine and child abuse and neglect.  During Dr. Natarajan's direct examination this happened:

> Q.    Doctor, in your -- in your second assessment, February 22nd, 2024, is it correct in stating that part of the documents or the information you reviewed was the four CJC interviews of the children?

        A.    Yes, we did review those. I did.

        Q.    Okay.  And, Doctor, in your opinion, do you find the children credible?

        A.    Yes, I do.

        [FATHER'S ATTORNEY]: Objection, Your Honor.

        THE COURT: Basis?

        [FATHER'S ATTORNEY]: That's for the Court to decide.

        THE COURT: Overruled.

        Q.    (BY [DHS'S ATTORNEY]) Doctor, can you please answer that question again?  Do you find the children credible in the four CJC interviews in this case?

        A.    Yes, I do.  As a pediatrician, I do.

The supreme court has held:

> Child victims of sexual abuse have exhibited some patterns of behavior which are seemingly inconsistent with behavioral norms of other victims of assault.  Two such types of behavior are delayed reporting of the offenses and recantation of allegations of abuse.  Normally, such behavior would be attributed to inaccuracy or prevarication. In these situations it is helpful for the jury to know that many child victims of sexual abuse behave in the same manner.  Expert testimony exposing jurors to the unique interpersonal dynamics involved in prosecutions for intrafamily child sexual abuse may play a particularly useful role by disabusing the jury of some widely held misconceptions so that it may evaluate the evidence free of the constraints of popular myths[.]

State v. Batangan, 71 Haw. 552, 557–58, 799 P.2d 48, 51-52 (1990) (cleaned up).  But in criminal cases involving sex abuse of a child, an expert witness's "conclusory opinions that . . . the child victim's report of abuse is truthful and believable is of no assistance to the jury, and therefore, should not be admitted. Such testimony is precluded by [Hawaii Rules of Evidence] Rule 702."  Id. at 558, 799 P.2d at 52.  "[E]xperts may not give opinions which in effect usurp the basic function of the jury." Id. at 562, 799 P.2d at 54.  The family court erred by overruling Father's objection when the State asked for Dr. Natarajan's opinion about T.J. and I.T.'s credibility.

In Batangan the complaining witness testified at trial. The supreme court stated:  "As in most child sexual abuse cases, where the only evidence consists of the victim's accusation and the defendant's denial, expert testimony on the question of who to believe is nothing more than advice to jurors on how to decide the case."  Id. at 559, 799 P.2d at 52 (quotation mark omitted). Here, the family court's finding that Father sexually abused T.J. and I.T. was supported by DHS's December 5, 2023 Safe Family Home Report, testimony from Cezar, San Nicolas, Gillespie, and Dr. Najera, the family court's unchallenged findings of fact, and the court's finding that Father was not a credible witness. Under these circumstances, the court's evidentiary ruling about Dr. Natarajan was harmless error.  See State v. McDonnell, 141 Hawaiʻi 280, 297-98, 409 P.3d 684, 701-02 (2017) (stating that error in admitting expert's testimony on statistics was harmless because "[e]rror should not be viewed in isolation and considered purely in the abstract, but must be examined in light of the entire proceedings and given the effect to which the whole record shows it is entitled" (quotation marks omitted)).

The September 9, 2024 Orders Concerning Child Protective Act entered in FC-S No. 23-00105 and FC-S No. 24-00081 are affirmed.

DATED: Honolulu, Hawaiʻi, February 28, 2025.

On the briefs:

Herbert Y. Hamada,
for Father-Appellant.

Eric J. Alabanza,
Julio C. Herrera,
Deputy Attorneys General,
Department of the Attorney
General, State of Hawaiʻi,
for Petitioner-Appellee
The Department of Human
Services.

Makia Minerbi,
Legal Aid Society of Hawaiʻi,
Guardian Ad Litem.

/s/ Keith K. Hiraoka
Presiding Judge

/s/ Clyde J. Wadsworth
Associate Judge

/s/ Sonja M.P. McCullen
Associate Judge